MILFORD A. BARNES v. NORTHWEST AIRLINES, INC.
RAYMOND D. EMERSON v. SAME.
ADONNA R. THOMPSON v. SAME.[1]

March 22, 1951.

Nos. 35,229, 35,230, 35,231.

[1]Reported in 47 N. W. (2d) 180.

*Bauers & Carlson, Robert W. Barnett,* and *William H. DeParcq,* for appellants.

*Clarence U. Landrum,* United States Attorney, and *Linus J. Hammond,* Special Assistant to the United States Attorney, for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeals by plaintiffs from orders of the district court denying their motions for new trials after verdicts for defendant.

These cases, which were consolidated for trial, arise out of an airplane accident which occurred on December 8, 1945, at Billings, Montana. Decedent in the Thompson case and the plaintiffs in the two other cases were soldiers in the United States Army and were being ferried from Newark, New Jersey, to Paine Field, Washington, for the purpose of being discharged. While attempting to land at the airport at Billings, the plane in which they were passengers crashed after cutting off the tops of some trees a half mile south of the south boundary of the airport, which is located on a plateau several hundred feet above the city at Billings.

The flight to Minneapolis appears to have been routine. There, Captain George D. Miller and copilot Vernon Pfannkuch took over the plane, which stopped at Fargo and took on fuel. A cold front and snow reached Billings at about 1:13 a. m. on December 8. At that time visibility was recorded at ten miles, and it decreased gradually thereafter. At 2 a. m., the visibility was three-fourths of a mile and at 2:13 a. m. a half mile, at which time it was snowing. As the plane approached Billings, it was first contacted by control tower operator Robinson at 1:59 a. m. over a fan marker known as "Nibbe," which is about 25 to 30 miles northeast of the Billings airport. It then reported its height at 5,500 feet above sea level, when the plane was cleared to enter the traffic pattern to land on runway 34, the north-south runway at the Billings airport. It further appears that the altimeter reading at the field, above sea level, was given to the pilot so that he could set his altimeter accordingly for the purpose of landing. The weather bureau and the control tower personnel observed the lights of the plane about 2:11 a. m. flying westward from the south edge of the field at a height above the field of between 200 and 400 feet. The control tower operator saw the plane pass to the west and then start to turn to the left, or south, for the purpose of lining up with runway 34. Its speed appeared to be normal. He next observed the lights coming into view again below where he usually saw them on approaching planes. He advised the pilot to "pull up," but he re-

ceived no response from the plane, which crashed about a half mile south of the field. It appears from the record that immediately before the crash a resident in the vicinity where the plane went down heard it; that at first the motor sounded normal; that he then heard a loud gunning of the plane's motors; and that it then crashed.

The trial before a jury resulted in a general verdict for defendant in each case. From a denial of their motions for a new trial, plaintiffs appealed to this court. Numerous assignments of error were made, but we shall regard only those which are determinative of the case.

The theory upon which plaintiffs have proceeded is that defendant was an independent contractor and that the principles of law relating to independent contractors are applicable here in determining its liability to plaintiffs. Defendant contends that the evidence shows that the military forces had the authoritative power and the right to control and did control the manner and means of the performance of the services on the project, and that the work of the project was the work of the military forces, so as to gain governmental immunity.

We shall briefly summarize the contractual relationship of the United States government and defendant. Pursuant to statutory authority (10 USCA, § 1361), the President of the United States, on December 13, 1941, issued and promulgated his Executive Order No. 8974 (6 Fed. Reg. 1941, Part 6, p. 6441), wherein the secretary of war was authorized and directed to take possession and assume control of any civil aviation system or systems, or any part thereof, to the extent necessary for the successful prosecution of the war then in progress. Pursuant to the power entrusted to him, the secretary of war used the facilities and personnel of the domestic air carriers for many military purposes and projects during the war period. Gill v. Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785; Jackson v. Northwest Airlines, Inc. (D. C.) 75 F. Supp. 32. Because of the exigency created by the sudden outbreak of hostili-

ties, it became necessary to expedite proposed contractual relations between the government and private industry by issuing "Letters of Intent." These letters described briefly the work to be performed by the parties thereunder and provided that a contract covering the work to be done would be forthcoming. In the early part of 1942, defendant began operating under these letters of intent, and in February 1943 a contract was negotiated between defendant and the United States government, which contract was referred to as the "Overall Contract."

Under this overall contract, the air carriers and defendant agreed to perform for the United States, at its direction, military services such as air transportation, modifications, etc., at such time as the government would direct by "Service Orders," the costs to be paid by the United States, and the air carriers to be paid a fixed fee for the services performed on each project. The overall contract provided as follows:

"(e) The extent and character of the services to be performed by the Contractor under any Service Order issued under this Contract and the manner of performance thereof shall be subject to the general supervision, direction, control and approval of the Contracting Officer or of the person designated in the Service Order, and the Contractor shall report and be responsible to the Contracting Officer or to such other person as may be so designed [designated]. Unless otherwise provided in such Service Order, the person designated in such Service Order may delegate any or all of his powers to supervise, direct, control and approve such services, and thereupon shall transmit notice thereof to the Contractor in the manner provided in Paragraph (c) of this Article for the transmission of Service Orders."

By article 24 of the overall contract, the air carriers were not to be held liable for the loss, destruction, or damage to government property used in performing the services, except through the wilful misconduct of its corporate officers.

Under special service order No. 11, defendant began the transportation of personnel designated by the military from the east to the west coast. For this purpose, defendant was provided by the government with a number of C-47B type government airplanes, one of which was the airplane involved in the fatal crash. In brief, the service order directed defendant to furnish air transport services and the miscellaneous services in housing and feeding passengers incidental to such services between the above-mentioned points along defendant's established routes. By the service order, a specified sum was made available to cover the cost of the services mentioned above, and, in addition, a specified fee was set to be paid defendant for these services. The service order provided also that the contract would be amended to the extent necessary to reimburse the contractor for all the costs incurred thereunder. Paragraph 6 of this service order reads as follows:

"The extent and character of the services to be performed by contractor under this service order and the manner of performance thereof shall be subject to the general supervision, direction, control and approval of the following, who is the person designated under Article 1 (e) of the above-numbered contract: Commanding General, Air Transport Command."

The Air Transport Command was the war department agency designated to transport personnel, material, and mail by air. The operations of the Air Transport Command were divided into geographical divisions, and each division was further divided into echelons of command, through which the Air Transport Command conducted its business. The priorities and traffic section was responsible for the movement of all cargo, mail, and passengers aboard aircraft of the Air Transport Command and the establishment of priorities for these movements. The operations department was responsible for aircraft in flight and on the ground, for scheduling, and safety. Weight and balance officers within the operations department were responsible for insuring the safety of the load of the aircraft and the over-all weight of the same. The Air

Transport Command was directed to utilize "to the fullest extent possible, both within and without the United States, of the services, facilities and personnel of the civil air carriers," and within the division organization provision was made for a "Contract Carrier Supervisor," whose duty it was to see that the contract carriers complied with all the rules and regulations of the government, and the contract carrier supervisor had available to him all branches of the command in carrying out his supervisory work.

The two major air transport projects to which defendant assigned personnel were the "Trans-Con Project," under consideration here, and the "Northern Region Operation." See, Gill v. Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785, *supra*. Major Clayton V. Prosser, the contract carrier supervisor, testified that the directives and regulations issued by the military forces and applicable to the air transport work on the "Northern Region Operation" were also applicable to the "Trans-Con Project." Plaintiffs contend that defendant's exhibits Nos. 25 to 121, which purported to be the directives and regulations relating to the Trans-Con project, were not admissible because of irrelevance and lack of foundation. An examination of these exhibits reveals that they relate to the organization, responsibility, and duties of the Air Transport Command and its echelons with reference to its general purpose as a war department agency. They prescribe the markings, loadings, inspections, and maintenance of the aircraft; the minimum pilot and crew requirements; the restrictions as to maximum periods of flight time for pilots and crews; the duties of the pilots, etc. In brief, the directives and regulations contained in the exhibits prescribe for military control of all phases of the operation of aircraft coming under this project. We cannot set out in this opinion even a summary of all the exhibits introduced here, for to do so would require a volume. We shall consider later their admissibility with reference to the charge of the trial judge.

The questions involved, as suggested by plaintiffs in their brief, are as follows:

(1) Did the trial court err in refusing plaintiffs' requested instructions 2, 3, 4, and 5?

(2) Was it error for the court to admit in evidence defendant's exhibits 25 to 121, inclusive, in view of the claimed fact that exhibit C was intended as an "end all and cover all" of the contractual relationships?

(3) Was the trial court in error in its instruction on the doctrine of *res ipsa loquitur* when it injected into the instruction a claimed new issue, hereinafter referred to?

(4) Was the trial court in error in not instructing the jury to disregard claimed prejudicial remarks of counsel?

(5) Did the court err in failing to instruct the jury that if defendant was an independent contractor it, as a common carrier, owed the highest degree of care to its passengers?

■■■ Plaintiffs contend that the court erred in not granting their requested instruction No. 2 in connection with the loaned-servant doctrine and that the instruction as given by the court was highly prejudicial, in that it did not adequately state the law on the subject, nor did the court amplify its charge by providing the jury with tests or indicia of the relationship.

The position of plaintiffs can best be set forth by considering their assignment of error that the trial court erred in refusing to give plaintiffs' requested instructions Nos. 3 and 4, which read as follows:

"It is the contention of the plaintiffs that the defendant was an independent contractor. The written agreement between the United States and the defendant does not in itself necessarily solely govern this question. The doctrine of respondeat superior may depend not only upon the terms of the contract, between the parties thereto, but the conduct of the parties operating thereunder. The law is well settled that the contracts themselves do not neces-

sarily govern the question, and the relation of respondeat superior may depend entirely upon the conduct of the parties.

"There is no particular test or type of conduct which determine whether a person is an independent contractor. Each case must be decided upon the facts there presented. Certain facts to be considered by you are: Who hired Captain Miller, who fixed his pay, who fixed his hours of work, who had control of the work, who had control of the premises, who had control over the means of performance; nature of the work; supervision of work; control of personnel; furnishing of personnel and material; method of payment; freedom of the contractor in employment policy; and procurement of insurance covering personnel, social security payments and the like. Gill v. Northwest Airlines [228 Minn. 164], 36 N. W. 2d 785."

It is the contention of plaintiffs that because the trial court merely stated some of the abstract principles bearing on the issue of independent contractor the failure to give many basic indicia of the relationship as established by the evidence was error. They contend that the requested instructions would have assisted and enlightened the jury.

Plaintiffs, in their brief, set out 24 items which they regard as the basic elements of control. These elements relate to the hiring and firing of personnel; the shifting and transfer of such personnel from one project to another; seniority policy and bidding procedures; deductions for social security and income tax; workmen's compensation carried by defendant for its employes; defendant's contract with the pilots association for its employment practices and procedures; determination by defendant and its pilots as to pay and pay computation, vacation, expenses, and moving expenses; the method of handling grievances; complete control by the pilot of the plane; his power to refuse to take it aloft and his discretion to land at any place; the pilot and line route checks conducted by defendant; and the gross weight, gas load, and passenger limitation as within the discretion of the pilot.

That these are all elements to be considered by the jury in determining the existence of the relationship was set out by this court in Gill v. Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785, *supra*. The court in that case had the question of independent contractor before it on an appeal from an order denying a new trial after directing a verdict for defendant. The trial court there directed a verdict for defendant on the motion of defendant based on the ground that the work performed by defendant was a governmental function; that the United States government had complete control of the "northern-region" project through its military agencies; that defendant had no separate identity whatsoever; that plaintiff failed to prove any negligence on the part of defendant; and that because of the control vested in the United States the doctrine of *res ipsa loquitur* had no application. The trial court in that case did not specify on which of the above grounds its order was based. On appeal, we had to decide whether the evidence presented a question for the jury as to whether facts existed from which an independent-contractor relationship might be established. We set out certain factors in the Gill case which were considered by this court in determining the question. Those factors were adopted by plaintiffs here in their requested instructions. It can readily be seen that this court did not intend in the Gill case that these were to be the *sole* factors determinative of the issue, nor that they were to be adopted as the instructions of the trial court on retrial of that case or similar ones. The evidence there was examined to determine if defendant was entitled to a directed verdict. We said that there is no particular test or type of conduct which determines whether a party is an independent contractor, and that each case must be decided on its facts. Where the attendant circumstances allow a jury to find that a contract in itself does not express the true relationship of the parties thereto, it may determine from the facts presented relative to the conduct of the parties whether an independent-contractor relationship existed as to a party thereto. Gill v. Northwest Airlines, Inc. *supra*.

The same considerations apply to the argument of plaintiffs that the elements found by the court in Jackson v. Northwest Airlines, Inc. (D. C.) 75 F. Supp. 32, are controlling. That was an action to recover overtime compensation under the Fair Labor Standards Act of June 25, 1938, as amended, 29 USCA, § 201, *et seq.*, by plaintiffs, who were employed by defendant, then engaged in a bomber modification project for the government. The independent-contractor ruling came into the court's opinion there on the "production of goods for commerce" question. We do not consider that case as authority for the proposition that such elements must be set out by the trial court in its instructions to the jury.

The fact that a requested instruction is in the language of an appellate court does not necessarily mean that it must be given as an instruction. Carter v. Duluth Yellow Cab Co. 170 Minn. 250, 212 N. W. 413. A court, through its instruction, is not authorized to give prominence to and emphasize particular facts disclosed by the evidence, thus singling out elements or views upon the controversy which were proper for argument and discussion by counsel, but which might very justly be declined to be thus noticed by the court. Atwood Lbr. Co. v. Watkins, 94 Minn. 464, 103 N. W. 332; 6 Dunnell, Dig. § 9784; Taubert v. Taubert, 103 Minn. 247, 114 N. W. 763. The trial court, in its charge, could not set out all the facts and circumstances from which the relationship is determinable here. This would have required a review of the evidence. It is purely discretionary with the trial court to review the evidence in its charge, and neither party can require such a review. 6 Dunnell, Dig. § 9784, and cases cited under note 72. Counsel has the opportunity to do this in his argument, and, while we do not have the argument before us, it is reasonable to assume that this was done. In reviewing a court's charge to the jury, we must do so in its entirety and not just consider excerpts taken from various parts of the charge. Froden v. Ranzenberger, 230 Minn. 366, 41 N. W. (2d) 807. As it is, the court's charge in the instant case takes up almost 20 pages of the transcript. To further tax the jury, which

had been listening to the evidence for a period of over two weeks, by a review of the evidence contained in 590 pages of transcript and approximately 150 exhibits would seem unwarranted.

All that is required in the way of instructions is that the charge as a whole convey to the jury a clear and correct understanding of the law of the case. The charge should not assume the existence of facts in controversy, or lay too much emphasis on particular facts or the testimony of particular witnesses. It is the duty of the court to lay down the law according to its own interpretation of it and not necessarily in accordance with the interpretation of counsel. Considerable latitude must be allowed the trial court in the language used so long as the substance of the law is correctly stated. 6 Dunnell, Dig. & Supp. § 9781, and cases cited under notes.

In order to determine the issue whether defendant was an independent contractor, we set forth herein the trial court's instructions bearing on that issue:

"Now there are three principal questions here that the jury will have to pass on. The first question is, who was responsible for and in control of the operation of this airplane? Was it the government of the United States, or was it Northwest Airlines? Plaintiff claims that it was the Northwest Airlines, and that the Northwest Airlines was, in legal parlance, an independent contractor. Defendant denies that, and says that they were simply agents or servants of the United States government, performing their duties under directives from the Air Force Command. Well, now we have some tests in law bearing on that matter, and I will call your attention thereto. The test as to whether a person is an independent contractor or an employee in these cases is whether the government, under the arrangement with the Northwest Airlines, had or had not any authoritative control of Northwest Airlines with respect to the manner and means in which and by which the details of the work was to be performed, as distinguished from the right, which every owner or general contractor has, to supervise and coordinate the general work. Or to state it differently, the test to determine

whether one who renders service to another does so as a contractor or not, is to ascertain whether he renders the service in the course of an independent occupation, representing the will of his employer only as to the result of the work and not as to the means by which it is accomplished. So you will bear that distinction in mind. Did the control of the government go to the method and manner and means in which this flight was carried on, or was it limited to the result only of having the troops transported from the airfield in Newark, N. J., to Seattle, Wash.? That is the distinguishing feature, and you are called upon to determine that from the evidence, not only the testimony of witnesses, but the contracts involved here, the directives that have been received, all the evidence that has been received in this court.

"As to the relationship of master and servant, the defendant claims, you know, that the government was the master and the employer, and Northwest Airlines and its pilots were its servants. Plaintiffs claim the Northwest Airlines was the master and the employer, and the pilots and the others were the servants and employees of Northwest Airlines. The determining question on that is the right of control of the conduct of the persons doing the work in the course of their employment. The law is that where a servant is carrying on the business of his master, his conduct is chargeable to the master, or, if he is an employee, the conduct is chargeable to his employer. If his conduct is wrong, negligent, and that causes harm to others, the master or the employer is chargeable with it to the same extent as if he did it himself. So if you find that the government had the control, as I have outlined to you, of these activities and the pilots and the employees and the planes, then if there was any negligence there that caused the plane to crash and cause damage and injury to these parties, that responsibility rests on the government and not on Northwest Airlines. So we are concerned here with the relationship that existed at the time of the accident between the defendant Northwest Airlines and the United States, and between the defendant Northwest Airlines and the

pilots. Were those pilots the servants of the government at that time, pursuing its business, carrying it out, or were they servants of Northwest Airlines?

"Now we have another principle of law I want to call your attention to. The defendant claims here that Northwest Airlines hired the pilots and turned them over to the Air Command to operate the planes. Plaintiffs claim that that is not so; they did not turn them over at all; they retained control of them; they remained their servants and their pilots all of the time. Now this is the law: When one person puts his servant at the disposal of and under the control of another for the performance of a particular service, then that servant is to be dealt with as the servant of the latter, and not the former. To apply it to the case at bar, if you find that the Northwest Airlines put its servants and pilots at the disposal of and under the control of the United States government for the performance of this airplane flight, such servants and pilots are to be dealt with as servants of the United States government, and not of the Northwest Airlines. If you find that these pilots and employees were servants of the United States government, then that will end the case right there,—there could be no recovery against the Northwest Airlines.

"However, if you find that the Northwest Airlines was an independent contractor and had control and direction over those pilots and servants in the course of that flight, and that the relationship was that of master and servant at the time of the accident, then Northwest Airlines is responsible for their conduct. And if you reach that conclusion, then you proceed next to determine whether or not there was negligence."

It is the contention of plaintiffs that because the court merely stated some of the abstract principles bearing on the issue of independent contractor the failure to give many basic indicia of the relationship as established by the evidence was error. They argue that their requested instructions Nos. 3 and 4 would have

aided, assisted, and enlightened the jury in the matter. After carefully reviewing the above instruction, we cannot hold that it constituted reversible error. A charge which is substantially correct is sufficient. Old Colony L. Ins. Co. v. Moeglein, 165 Minn. 117, 205 N. W. 885. It appears to us that the trial court here laid down the law according to its own interpretation and that, considering the charge as a whole on the point involved here, it gave the jury a sufficient, clear, and correct understanding of the law so as to enable it to consider and determine the case before it.

Considering, in conjunction herewith, that part of the charge pertaining to the loaned-servant doctrine, plaintiffs requested their instruction No. 2, to the effect that it appears without dispute that Captain Miller, the operator of the plane, was hired and employed by defendant for a considerable period of time prior to the happening of the accident; that defendant could not, by contract or otherwise, make Captain Miller the agent or servant of the government, in that such employment could not be thrust upon him without his knowledge or consent; that before the jury could find that Captain Miller was an employe of the government defendant must show that Miller understood that he was submitting himself to the control of the government; that there was no evidence that Captain Miller was ever informed of any intention on the part of defendant to make him an employe of the government; and that the jury should have been instructed as a matter of law that Captain Miller, at the time of the happening of the accident, was an employe of defendant, for whose negligence, if any, defendant would be liable. It will be noted that the court, in discussing this matter in its instructions, set out that defendant claimed that it hired the pilots and turned them over to the Air Force Command to operate the planes; that plaintiffs denied this and maintained that defendant retained control of the pilots and that they remained servants of defend-

ant during all the time involved. The trial court then said in that part of its instruction:

"* * * When one person puts his servant at the disposal of and under the control of another for the performance of a particular service, then that servant is to be dealt with as the servant of the latter, and not the former."

The court then went on to say that if the jury found that defendant put its servants and pilots at the disposal of and under the control of the government for the performance of the project under consideration those servants and pilots were to be dealt with as servants of the United States government and not of defendant, and that if they found that those pilots were servants of the government there could be no recovery against defendant. Immediately following this, however, the court continued to say in its instruction that if the jury found that defendant was an independent contractor and had control and direction over the pilots and servants in the course of the flight, and that the relationship was that of master and servant at the time of the accident, then defendant was responsible for their conduct and the jury should then proceed to determine whether there was negligence. The court next proceeded to define negligence and charged the jury to draw upon its experience and observations in life in analyzing the evidence to determine if there was negligence on the part of the operators of the plane; that if there was negligence and such was the direct and proximate cause of the accident, liability attached. Later in its charge, the court stated that if the jury, after considering the evidence fairly, honestly, and impartially, without sympathy, bias, prejudice, or emotion, concluded that defendant was in charge of the operation and was negligent, the verdict should be for plaintiffs.

Plaintiffs argue that it was highly prejudicial for the court to instruct to the effect that when one person puts his servants at the disposal and under the control of another for the performance of a particular service that servant is to be dealt with as

a servant of the latter and not of the former, in that such instruction did not adequately state the law on the subject. They contend that before a servant of one master can become the servant of another he must have knowledge of the transfer and must consent to the transfer, and that there must be complete supervision and control exercised over that servant. The law is well established that before a new employer may be thrust upon an employe the latter's express or implied consent to the new relationship must be found. Dahl v. Wunderlich, 194 Minn. 35, 259 N. W. 399; Yoselowitz v. Peoples Bakery, Inc. 201 Minn. 600, 277 N. W. 221; Turner v. Schumacher Motor Express, Inc. 230 Minn. 172, 41 N. W. (2d) 182. There is merit to plaintiffs' contention in connection with that part of the court's charge which they refer to as prejudicial if we consider that part of the charge alone and not in conjunction with what immediately follows. However, viewing the court's charge in its entirety, as we must necessarily do, and not just excerpts taken from various parts of the charge, we find no reversible error in the point raised by plaintiffs.

Since the oral arguments, plaintiffs have called our attention to Terminal R. Assn. v. Fitzjohn (8 Cir.) 165 F. (2d) 473, 1 A. L. R. (2d) 290, as controlling. That case was decided prior to our decision in Gill v. Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785, *supra*. It was an action brought under the Federal Employers Liability Act, 45 USCA, § 51, *et seq.* In the Fitzjohn case, the defendant admitted in its answer that plaintiff was in its general employ, but asserted that he was in the special service of the United States, and that under the "lent servant" doctrine he was not a servant of defendant at the time of his injury. Plaintiff's undisputed testimony in that case was that he had never been advised that there had been any change in the nature of his employment by defendant from that which existed prior to the arrangement of April 5, 1943. There was testimony by defendant's superintendent that during the prelim-

inary discussion preceding the April 5 arrangement the government plant officials stated that they must have complete authority over the switching crew. There was no intimation in the record that plaintiff knew anything about that, other than such inferences as he might have drawn from the actual practice followed in the giving of daily instructions by plant officials in carrying out the switching work. Under that state of facts, the trial court instructed the jury that plaintiff was an employe of defendant within the meaning of that term as used in the Federal Employers Liability Act. Upon appeal, the court found no error in that instruction. Under our holding in the Gill case and under the facts and circumstances here, we feel that the Fitzjohn case is not applicable here.

We here have no way of determining, in view of the general verdicts, whether the jury found in favor of defendant or plaintiffs on the question of independent contractor. It is sufficient to say that the evidence presented at least a fact question for the jury as to whether facts existed which might establish an independent-contractor relationship. Gill v. Northwest Airlines, Inc. 228 Minn. 164, 36 N. W. (2d) 785, *supra.*

We come now to the admissibility of the directives and regulations contained in exhibits numbered 25 through 121. These were strenuously objected to on grounds of irrelevancy and lack of foundation. We find no prejudicial or reversible error in the admission of these exhibits. Both the overall contract and Service Order No. 11 contained the provision that in the manner and means of performance of the contract defendant should be subject to the general supervision and control of the contracting officer, or subject to the control of the person designated in the service order. In its operations and in the period of emergency especially, the government was necessarily required to act through echelons of command, through directives, and through memorandums and regulations to govern the conduct of its officers, subordinates, and those it controls. Under the facts in this case,

these officers cannot be held to have acted independently of the echelon of which they were a part so that its regulations did not guide them in the supervisory duties imposed upon them by the contract. In effect, these regulations were incorporated by reference into the contract and service order, and their admission did not constitute reversible error. In determining such admissibility, we cannot be guided by what witnesses for defendant could have testified to but failed to do. Nor is it fatal to their admissibility that plaintiffs' witnesses, pilots Lester E. Wagner and Carl Graf, testified by deposition that at no time had army control over them ever been exercised. We do not agree that these witnesses, by virtue of their position, were the ones with the most direct knowledge of how the parties conducted themselves under the contractual relations between the government and defendant. The testimony of Major Clayton V. Prosser, contract carrier supervisor, showed that the military intended and did actually exercise supervisory powers over the contractor. The court thus properly charged that the jury should consider all the evidence in the case, the contracts and directives, and the testimony of the witnesses. It left the weight to be given these directives to the jury when it charged that the responsibility rested wholly and entirely with the jury as to what the truth was from that evidence.

Specifically referring to defendant's exhibit No. 121, the overall contract, plaintiffs contend that by virtue of the subsequent contract entered into after the date of the accident (plaintiffs' exhibit C) a substitution had taken place by agreement and that thereafter the sole remedy was upon the new agreement. That principle has no application here, where the action is based on negligence and not on contract and wherein the relationship must be determined by the provisions of the contract in existence at the time of the occurrence of the alleged negligence and the conduct of the parties thereunder.

In connection with the claim of plaintiffs that the trial court erred in refusing their instruction No. 5, we come to a con-

sideration of plaintiffs' contention that the charge of the court with respect to the doctrine of *res ipsa loquitur* was erroneous and highly prejudicial, particularly when it injected into the instruction what plaintiffs claim was a new issue, to the effect that defendant is not liable if there were several unexplained causes of the accident, since they maintain that there was no evidence of such unexplained causes.

To make the rule applicable, it must appear, among other things, that the instrumentality causing the injury was under the control of defendant. Heffter v. Northern States Power Co. 173 Minn. 215, 217 N. W. 102; Kleinman v. Banner Laundry Co. 150 Minn. 515, 186 N. W. 123, 23 A. L. R. 479. In a proper case, if there is sufficient doubt, the question of control over the instrumentality can become one for the jury; if they find the existence of such fact, they can apply the doctrine and are justified in returning a verdict for plaintiff. Hector Const. Co. Inc. v. Butler, 194 Minn. 310, 260 N. W. 496. However, we need not decide the applicability of the rule to airplane accidents. It is sufficient to say that an instruction on *res ipsa loquitur* was given. That instruction reads in part as follows:

"* * * Now if you find from the evidence, a fair preponderance of the evidence, that the Northwest Airlines had control and dominion over that airplane and the pilots immediately before and at the time of the crash, then you will apply this rule: When a thing which has caused an injury is shown to be under the exclusive management and control of the defendant, Northwest Airlines in this case charged with negligence, and the accident is such as in the ordinary course of things would not happen, if those who were in such control used proper care, the circumstances attendant upon the accident may permit a reasonable inference that the negligence was the cause of the accident. So the jury will examine the evidence, and determine whether, from the evidence, from all the facts and circumstances attending upon that crash, — whether you feel justified as reasonable men and

women to draw the inference that there was negligence in the handling of that plane on the part of the pilot."

Plaintiffs had the benefit of going to the jury with this instruction, and the jury returned verdicts in favor of defendant. The rule of *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference. Even assuming that the doctrine is applicable to the facts here, this court has repeatedly held that it merely justifies a verdict for plaintiff, but does not compel it. Heffter v. Northern States Power Co. 173 Minn. 215, 217 N. W. 102, *supra;* Marsh v. Henriksen, 213 Minn. 500, 7 N. W. (2d) 387. Plaintiffs strongly urge that there was reversible error when, after stating the rule, the court said:

"* * * This rule, however, does not apply where an unexplained accident may be attributable to one of several causes, for some of which defendant is not responsible. If there are other causes operating there for which defendant is not responsible, this rule to infer negligence is not applicable."

Plaintiffs contend that the interjection of this statement as to other causes introduced a new issue into the case, an issue which was not supported by the evidence, and that this constituted reversible error. With this contention we cannot agree. As an abstract proposition of law, the instruction was correct, although it may not have been pertinent to the case, for the existence of other causes operating for which defendant is not responsible is an insurmountable obstacle to the application of the *res ipsa loquitur* rule. But this is not grounds for reversal where it was harmless under the circumstances and not calculated to mislead the jury. Jacobson v. C. & N. W. Ry. Co. 221 Minn. 454, 22 N. W. (2d) 455. We cannot presume that the jury thereby was directed to find other causes where none existed, particularly since the trial court further instructed the jury that it could not go into the field of speculation and conjecture, but must be governed by the evidence

in the case. See, also, Lang v. C. & N. W. Ry. Co. 208 Minn. 487, 295 N. W. 57; Hector Const. Co. Inc. v. Butler, 194 Minn. 310, 260 N. W. 496.

■ Plaintiffs contend that the attorney for defendant made a statement in his closing argument in violation of a pretrial agreement which constituted misconduct, and they raise the question whether the trial court erred in not instructing the jury to disregard the remarks. In their brief, plaintiffs state that defendant's counsel argued to the jury that plaintiffs were entitled to disability and that to find in their favor would be taking an unfair advantage through a legal technicality. Plaintiffs did not take exception to the statement at the time it was made, but did so when court reconvened the following morning. Plaintiffs claim that after the jury was impaneled and before any testimony was taken a pretrial conference was held in the court's chambers. They claim that at this conference they expressed concern that an attempt might be made by defendant to show that plaintiffs had received certain soldiers' benefits, such as insurance and disability compensation, and that they requested the court to instruct defendant's counsel not to refer to these matters. They then claim that it was agreed between the court and plaintiffs' and defendant's counsel that the latter would be permitted to ask the question solely for the purpose of establishing the relationship between plaintiffs and the government at the time of the accident, but that this proposed evidence could not be used for any other purpose.

While we do not sanction or condone any breach of agreements, pretrial or otherwise, between counsel or between the court and counsel in any case, we do not have before us the argument of counsel. Defendant's counsel agreed that he was correctly quoted in substance in connection with the exception taken to the part of the argument complained of, but stated that there was no reference to disability benefits or insurance benefits. It does not appear that plaintiffs excepted to the statement at the time it

was made, although the record shows that the exception was made before the court's charge to the jury on the following day. No request was made of the court to rule on the question at the time or to direct the jury to disregard the particular statement.

In Eilola v. Oliver I. Min. Co. 201 Minn. 77, 80, 275 N. W. 408, 409, this court said:

"* * * Ordinarily, in order to obtain a review of misconduct of counsel in argument, there must be an objection at the time of the alleged misconduct, a request by the party claiming to be prejudiced for appropriate corrective action, and a failure of the trial court to rule or act. Powell v. Standard Oil Co. 168 Minn. 248, 210 N. W. 55; 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 9800."

It is true that the court in its charge did not tell the jury to disregard the statement complained of here, but he did say:

"* * * If, during the course of the argument or during the course of the trial, counsel shall have made statements as to what the evidence was that do not conform to your recollection of what the evidence was, you will disregard all such statements and rely wholly and entirely upon your own recollection."

It appears to us that under the facts and circumstances here the failure of the court to specifically instruct the jury to disregard the claimed prejudicial remarks of counsel did not constitute reversible error. The matter of soldiers' benefits was at least before the jury by consent when defendant was permitted to ask the question as to such benefits for the purpose of establishing the relationship between plaintiffs and the government.

■ Plaintiffs contend also that Kenneth R. Ferguson, the vice president of defendant, should have been allowed to testify as to whether or not he regarded the pilots navigating the army planes as employes of and subject to the direction of defendant, over objection by the latter that it was calling for a legal conclusion of the witness and usurping the power of the court and of the

jury. The objection by defendant was well founded, and the ruling of the trial court was correct. With respect to the failure of the trial court to charge that if the jury found defendant to be a common carrier of passengers for hire as such it owed a duty to plaintiffs to exercise the highest degree of care, we do not agree that the inadvertent omission of this statement had the effect of depriving plaintiffs, in all probability, as plaintiffs assert, of a verdict in their favor. We regard this omission as harmless error, to which the court's attention should have been called in a timely manner.

Plaintiffs also cite as error that the trial court sustained defendant's objection to the introduction of plaintiffs' offer of the army board's investigation report. We think that the report was properly excluded from evidence, not on the ground that it was not properly certified or exemplified, but upon the more serious ground that reports or records of investigation and inquiries containing expressions of opinion or the exercise of judgment and discretion are not admissible in evidence as public records. 20 Am. Jur., Evidence, § 1027; Commonwealth v. Slavski, 245 Mass. 405, 140 N. E. 465, 29 A. L. R. 281; Franklin v. Skelly Oil Co. (10 Cir.) 141 F. (2d) 568, 153 A. L. R. 156. Defendant had no opportunity to cross-examine with reference to the report nor anyone making it. The conclusions contained therein were hearsay, and the court properly excluded it. Clancy v. Daily News Corp. 202 Minn. 1, 277 N. W. 264.

We have tried to give the record in this case our most serious study. Naturally, our sympathies go out to plaintiffs and their families. However, as a court, we are bound by rules and precedents. Among the rules are the ones that upon appeal we must view the evidence in the light most favorable to the prevailing party, and we must affirm unless the verdict is manifestly and palpably contrary to the evidence or unless there are errors of law occurring at the trial which justify a reversal. It is our opinion

that considering the evidence and the charge of the court in its entirety the orders of the trial court denying motions of plaintiffs for new trials must be affirmed.

Affirmed.

MR. JUSTICE CHRISTIANSON took no part in the consideration or decision of this case.

