NORTHWEST AIRLINES, Inc., a Corporation, Appellant,

v.

Ruth Wien ROWE, Administratrix of the Estate of Louis Wien, Appellee.

No. 15334.

United States Court of Appeals
Eighth Circuit.

Oct. 25, 1955.

Pierce Butler, III, St. Paul, Minn. (Richard J. Leonard and Doherty, Rumble & Butler, St. Paul, Minn., on the brief), for appellant.

Clifford W. Gardner, St. Paul, Minn. (Robert J. Monson, St. Paul, Minn., on the brief), for appellee.

Before SANBORN, COLLET and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

This is an action for wrongful death arising out of the crash of the defendant's aircraft into a mountain. The parties will be designated as they were below. The plaintiff is the administratrix of the estate of Louis Wien. Jurisdiction is based upon diversity of citizenship. The defendant appeals from final judgment for plaintiff based upon the jury verdict.

The defendant operates a public commercial airline flying under published schedules over established routes. The flight here involved originated in Chicago with its destination Seattle via intermediate points. At Minneapolis a crew and equipment change was made and a Martin 202, the plane which crashed, was put into service. Louis Wien boarded the plane at Helena, Montana, as a paying passenger for Butte, Montana, on November 7, 1950. It is stipulated that the flight up to and including the take-off from Helena, Montana, was regular in all respects; that the weather within itself did not cause or contribute to the happening of the accident; that both pilot and co-pilot were experienced and

qualified pilots, familiar with the plane used and the route over which it was operated; that the maintenance records of the plane revealed nothing to indicate any irregularity in company maintenance procedure or anything to suggest that the plane was not airworthy; and that the plane load and center of gravity were within permissible limits.

As required by Government regulations, a flight plan was filed which, as amended before take-off, required the plane to fly at 10,500 feet mean sea level under instrument flight rules, via Amber Airway No. 2 from Helena to Whitehall (a Government-maintained radio transmission station), and from there to Butte via Red Airway No. 2. At 8:01 a. m. the plane reported to Helena that it had reached the prescribed cruising altitude, and at 8:14 a. m. reported to Butte that it was over Whitehall at 8:11 and was starting to descend. Butte gave weather information. The plane reported it had vertical visibility at 10,500 feet. By vertical visibility is meant that the pilot can see down, but not necessarily that he can see ahead. This was the last radio contact.

The prescribed approach to Butte airport under the flight plan was that from Whitehall to Butte the plane could descend to 9,500 feet, and that after passing the Homestake Fan Marker, a signal device four miles from Butte, the pilot could descend to 8,050 feet. If the pilot was unable to see the Butte airport sufficiently for landing purposes at 8,050 feet, he was required to immediately climb to 10,500 feet and pass up Butte. The airway the pilot was authorized to use at 10,500 feet was ten miles wide, five miles on each side of the beam. However, when making the descent he was required to be on the beam which he had been directed to follow. This beam is created by radio signals that can be heard by the pilot, A signals predominating on one side of the beam, and N signals on the other. Pilots were provided with charts showing among other things the topography, location, and height of mountains, including the mountain involved in this crash. The approach procedure chart prescribed a heading of 275 degrees magnetic. Defendant's chief pilot testified as follows:

"Q. Captain, the place where this airplane came to rest on the morning of November 7, 1950, was not on the ordinary and usual course of the flight, or intended flight of that airplane, was it? A. It was not, no, sir.

"Q. * * * I say that where the wreckage was found on this date that this accident happened, the airplane was not and had not been prior to its crash on its normal planned course,—correct? A. That's correct."

The record would also support a finding that the defendant's plane was flying too low at the point of the crash. The plane was making an instrument flight because of limited visibility.

The parties stipulated that at approximately 8:15 the aircraft had struck the eastern slope of a ridge about 30 feet below its crest at an altitude of about 8,250 feet mean sea level, and that the wreckage indicated a heading of about 309 degrees true or 290 degrees magnetic. The site of the impact was approximately two and one-half miles east of the control tower at Butte, and about one and one-half miles to the right of the center of the on-course signal, assuming the signal was working properly, that is, the signal from Whitehall to Butte. The wreckage indicated that the plane at the time of the crash was in flight about level longitudinally and that full power was being developed. All crew members and passengers were instantly killed as a result of the crash.

The defendant contends that the radio beam was off course at the time of the crash and that this was the cause for the pilot being off course. The beams are under the control of the Government and not the defendant. The evidence bearing on this contention will be hereinafter developed.

Defendant contends that it is entitled to a reversal of the judgment upon the following grounds:

I. The verdict of the jury is against the weight of the evidence, and the evidence is insufficient to justify a verdict against defendant.

II. The trial court erred in submitting the case to the jury on the basis of *res ipsa loquitur* because it conclusively appears that the instrumentality which caused the injury was not under the exclusive management and control of defendant.

III. The court committed prejudicial error in admitting, over defendant's objection, the unauthorized statements of defendant's uninformed servant regarding the accident in question.

IV. The court's charge with respect to damages was prejudicial in that (a) it stated that there is no specific limit on the amount of damages that may be recovered by the plaintiff under Montana law and (b) that it unduly emphasized the possibility of liability of defendant. Such contentions will now be considered.

I. Defendant at the close of the evidence moved the court for a directed verdict upon the ground that the plaintiff had failed to prove any negligence on the part of the defendant which proximately caused the accident, and after verdict moved for judgment notwithstanding the verdict upon the same ground. Said motions were overruled.

■■ By the stipulation hereinabove referred to, many possible causes of accident, such as turbulent weather, faulty equipment, and inept pilots, were eliminated. There is in the record substantial evidence that at the time and place of the accident the plane was approximately one and one-half miles off its prescribed course, and was flying too low over mountainous terrain at a time when visibility was impaired. It would seem that this evidence, showing that the defendant's plane was in the wrong place at the wrong time, if unexplained, together with the other evidence in the record, would be sufficient direct and circumstantial evidence to support a finding of negligence. In Gill v. Northwest Airlines, Inc., 228 Minn. 164, 36 N.W.2d 785, the court reversed a directed verdict for the defendant, and found that evidence that the defendant was flying 40 miles off the beamed airway over rocky terrain was sufficient evidence of specific negligence to go to the jury. The court states, 36 N.W.2d at page 790:

"Likewise, the jury may well have found that the pilot's action in leaving the airway without authorization, because of the terrain then to be encountered, constituted negligence, rendering defendant liable for the subsequent crash. * * *"

In Orchard v. Northwest Airlines, Inc., 236 Minn. 42, 51 N.W.2d 645, a judgment for the plaintiff was upheld where there was evidence to support a finding that the defendant was flying too low in making an approach to the Billings airport.

The defendant's motions were also properly overruled in the event that the plaintiff has made out a submissible case under *res ipsa loquitur,* which proposition is hereinafter discussed.

II. In its reply brief defendant states its defense to be, (1) that the mere crash of an aircraft operated by defendant raises no inference of negligence, and (2) even if such an occurrence could give rise to an inference of negligence defendant must have a directed verdict where the instrumentalities involved were not in defendant's exclusive control and management.

The defendant contends that since the accident occurred in Montana the question of the applicability of the *res ipsa loquitur* doctrine to the facts in this case should be determined by the laws of Montana. The plaintiff contends that the laws of Minnesota should govern on this question. Neither side has indicated that there is any material difference between the laws of the two States upon the matters now under consideration, and in argument counsel conceded that it was

not important to the determination of the issues of this case to decide whether Montana or Minnesota law applies. It would therefore seem that it is not necessary to adjudicate this question. Counsel for both sides state in their briefs that neither Montana nor Minnesota has passed squarely upon the applicability of the *res ipsa loquitur* doctrine to airplane accidents, and our investigation leads us to the same conclusion. Cases from other jurisdictions which have considered this question have reached conflicting results. Such cases are collected in an Annotation in 6 A.L.R.2d 528. In such Annotation at pages 530–531, it is said:

> "Divergent conclusions have been reached, however, in cases involving accidents of a similar type, or occurring under similar circumstances, as to whether it can be said or found that such an accident does not ordinarily occur, or is not likely to occur, if due care has been used in respect of the condition and management of the plane, or, in other words, whether the accident reflects an inherent probability of negligence. This is explainable, in part, on the ground of the stage or degree of development of aviation at the time of the decision. But the cases also disclose the same division of judicial opinion along conservative and liberal lines that exists in respect of the application of the doctrine generally, and a more cautious attitude in some jurisdictions than in others toward the acceptance and application of the doctrine in actions arising out of aviation accidents. In several instances in which the doctrine has been held inapplicable the decision has been based upon the novelty of air navigation and the absence of a reliable background of experience for determining the balance of probabilities, as between negligence and natural hazards, as causative factors."

See also 6 Am.Jur., Aviation, § 77.

Our problem is not to determine which of the divergent views presents the better rule of law, but rather to determine the law that would be applied by the Montana court in the event Montana law controls, or by the Minnesota court in the event Minnesota law controls. We believe the same result would be reached in either event.

The Montana Supreme Court has applied the *res ipsa loquitur* doctrine to a variety of facts and circumstances. Its most recent opinions indicate that the Supreme Court of Montana is inclined to make a liberal application of the *res ipsa loquitur* doctrine. Harding v. H. F. Johnson, Inc., 126 Mont. 70, 244 P.2d 111; Whitney v. Northwest Greyhound Lines, 125 Mont. 528, 242 P.2d 257, 259.

In Whitney v. Northwest Greyhound Lines, a directed verdict against a bus passenger claiming to have sustained injuries when the bus rolled over in passing another vehicle was reversed because the instructions did not harmonize with the court's version of *res ipsa loquitur*, as to which the court says:

> "The *res ipsa loquitur* doctrine simply stated is this: When an instrumentality which causes injury, without any fault of the injured person, is under the exclusive control of the defendant at the time of the injury, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, the law infers negligence on the part of the one in control as the cause of the injury. The doctrine is especially applicable when there exists a relationship of passenger and carrier and applies to carriers by bus where injury results from overturning of the bus."

Later, in referring to the overturning of the bus, the court states:

> "This raises an inference or presumption of negligence in its operation because in the ordinary course of events a bus does not overturn if

the person in charge of its operation uses proper care."

In Harding v. H. F. Johnson, Inc., supra, [126 Mont. 70, 244 P.2d 114] defendant was delivering gasoline to plaintiff's underground tanks. There was evidence from which the jury could find that gasoline escaped because of a loose connection on the delivery hose. The court in speaking of *res ipsa loquitur* states:

"The court was right in applying the doctrine. It is clear from the evidence that the cause of the fire was the gasoline which was allowed to escape. Without it the fire would not have occurred. Just where the spark came from to ignite the gasoline is unimportant."

In Division No. I we stated that we thought it probable that the Minnesota court upon the theory of the cases there cited would find that there was sufficient specific evidence of negligence in this case to support a verdict for the plaintiff. In Gill v. Northwest Airlines, Inc., supra, the court makes the additional statement, 36 N.W.2d at page 790:

"Because of our conclusion on this issue, it is unnecessary to determine whether the doctrine of *res ipsa loquitur* would have been applicable."

■ The Minnesota trial judge who presided in the present case, who was in a position to be well informed as to the Minnesota law, felt it proper to submit the case on *res ipsa loquitur*. We can not say that he committed error in so doing under this record. We believe that there was evidence here from which it was possible for the jury to find that the happening of the accident was such as in the ordinary course of events would not have occurred without negligence on the part of the defendant. The necessary prerequisite of exclusive control will be considered hereinafter.

It should perhaps be noted that defendant has not raised the question that *res ipsa loquitur* should not be submitted because there is evidence of specific negligence, nor is this question urged in the briefs. The Montana court in Whitney v. Northwest Greyhound Lines, supra, holds that in a proper *res ipsa loquitur* case proof of specific negligence in support of a general allegation of negligence does not deprive the plaintiff of the benefit of *res ipsa loquitur*. It should perhaps be further noted that while the defendant did object to giving any *res ipsa loquitur* instruction, it did not object to the form of the instruction given, in fact, the instruction on the subject comes largely from the defendant's requested instructions, and the instruction is upon the basis that the rule of *res ipsa loquitur* gives rise to a permissive inference of negligence.

■ It is doubtless true, as contended by the defendant, that the doctrine or *res ipsa loquitur* can not apply unless it appears that the defendant has exclusive control of the instrumentality causing the accident. It is undisputed that the radio beams and control devices were operated and controlled by the Government, and that the defendant had no part in their operation. The defendant contends that its being off course was caused by the malfunctioning of the radio beams. If the evidence establishes this contention, the defendant would be entitled to a verdict. The trial court at defendant's request instructed as follows:

"If you find that the sole cause of the accident was defective maintenance or operation of government navigational facilities or aids, or if you find that the sole cause of the accident under consideration here was the prescribing by the Government of unsafe navigation or airport approach procedures, or if you find that the cause of the crash was the malfunctioning of Whitehall range signals, or if you find and believe from the evidence in this case that there was no negligence on the part of the defendant, its agents and employees, then your verdict should be for the defendant."

In Barnes v. Northwest Airlines, Inc., 233 Minn. 410, 47 N.W.2d 180, at page 191, the court says:

"* * * In a proper case, if there is sufficient doubt, the question of control over the instrumentality can become one for the jury; if they find the existence of such fact, they can apply the doctrine and are justified in returning a verdict for plaintiff. * * *"

This leads us to a consideration of the evidence bearing on defendant's contention that the accident was caused by the improper operation of the beam.

■ Captain Sorkness, a pilot employed by the defendant at the time of the crash and so employed at the time of the trial, testified that he and his co-pilot, Rowe, had been sent to Butte to join in the search for the crashed plane. Upon arrival they learned that the plane had been found and received orders to fly to Billings. On this flight Sorkness deviated from the beam to observe the crash site. He said that from the Butte airport he flew a track true east to a point that intersected a line through the crash site and the Whitehall range, and that all the way from Butte to the intersection he received a solid on-course signal. This testimony, if true, would indicate that the Government beam was operating improperly, in such a manner as to likely cause the crash. Sorkness, although he admitted that a situation such as he claimed to have detected was hazardous to all pilots and that such situations should be immediately reported for investigation and correction, made no report to the proper authorities, although he had equipment in his plane which would have made it possible for him to have immediately contacted and reported to the transmitting station. He made no mention of his discovery until several days later when gossiping about the accident. Upon the suggestion of one of his listeners he reported the above information to the chief pilot, Captain Luethi. It is stipulated that Captain Luethi did not include this information in the company's report of the crash to the Government subsequently made, nor did the company mention this as a possible cause of the accident in its letter of December 20 to the plaintiff, hereinafter referred to. It also appears to be significant that the co-pilot, Rowe, was not called upon to corroborate Sorkness's testimony. A careful reading of Sorkness's testimony shows it to be questionable and evasive. The jury was not compelled to believe this testimony even if uncontradicted. Noland v. Buffalo Ins. Co., 8 Cir., 181 F.2d 735, 738; Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 440.

■ The record does not show that Sorkness was trained to check the course of the signals, or that he exercised any special care in making his observations, or that he attempted to recheck his observations. The Civil Aeronautics Authority groundchecked and flightchecked the various signalling devices, and especially the beam and devices involved in the crash flight, on the day of the accident and on the following day and at other periods before and after the accident, and found no discrepancies or irregularities in the operation of such devices. The defendant participated in some of these checks. Further, there were a number of successful flights made over the beam in question both by pilots of the defendant line and of the Western Airlines on the day of the accident, as well as numerous successful flights before and since. No changes were made in the signalling devices for the involved beam after the crash. The jury was fairly instructed upon the control issue. We are convinced that the record would support a finding that the instrumentalities which caused the accident were exclusively under the management and control of the defendant. It follows that the defendant's motions for a directed verdict and for judgment notwithstanding the verdict were properly overruled.

III. The defendant urges that the court committed prejudicial error in admitting over defendant's objection Exhibit 6, a letter from the defendant to the plaintiff, said letter written by S. Wyman, Administrative Assistant to Vice President-Sales, reading as follows:

"Dear Mrs. Rowe:

"At Mr. Hunter's request, we have attempted to obtain as much information as we could regarding the identification of your father's remains. It seemed best that we secure the information from the person responsible for making the identification, and we, therefore, asked that Coroner Sayatovic write you a letter giving the details. His letter is attached. In view of the circumstances set forth in the letter, we feel satisfied that you should have no doubt but that the remains returned to you were truly those of your father as there seems to have been a number of items that permitted positive identification.

"Unfortunately, there is nothing further that we can tell you regarding the accident itself. It still remains a complete mystery as to why the flight was off course and at too low an altitude. The destruction of the aircraft was so complete it is very questionable that actual reasons for the disaster will ever be known.

"Please do not hesitate to contact us at any time that we may be of assistance to you."

On November 14, 1950, Hunter, the president of the defendant company, had written plaintiff a letter of sympathy, and on November 30, in response to a request by plaintiff for information, he had written in part, "I can understand perfectly your feeling and I have requested our people to send you any further information we may have regarding the accident."

Defendant in its brief sets out the following statement from Wigmore, 2 Evidence 585, 2d Ed., § 1078, "This question * * * depends upon the doctrine of agency applied to the circumstances of the case, and not upon any rule of Evidence." The foregoing statement appears to be a proper statement of the applicable law. Defendant then states that under Minnesota law the admission of an agent is not admissible where the agent is not acting in the course of his authority, and cites Minnesota authorities supporting such a rule. We have no quarrel with the rule urged. However, we do not believe that it applies to the facts in this case. The evidence shows that the president had agreed that the plaintiff would be furnished with all information available. Exhibit 6 on its face shows that the writer had investigated certain phases of the accident, and we think that it may be inferred that the president had authorized the writer of the letter to give the plaintiff such information as might be available with reference to the accident. 31 C.J.S., Evidence, § 343, pp. 1115–1116, states: "Ordinarily the statements must have also been based on the agent's own knowledge, but an authorized statement based on the report of others may be admissible." In Washington-Virginia R. Co. v. Deahl, 126 Va. 141, 144, 100 S.E. 840, 841, the court states:

"If, however, the statement related to a matter within the sphere of his authority, and was made in the course of an investigation or negotiation concerning that matter, then, regardless of how he derived his knowledge, he spoke as and for his principal, and his statement was admissible."

In 31 C.J.S., Evidence, § 354, p. 1130, it is said:

" * * * However, as a corporation, like an individual, may make admissions after the event, and as a corporation can act only by its agents, officers or agents possessing the requisite authority may affect the corporation by statements subsequent to the event."

See, also, Peoples Gas Co. of Ky. v. Fitzgerald, 6 Cir., 188 F.2d 198; Lobel v. American Airlines, Inc., 2 Cir., 205 F.2d

927. Under the record here we do not believe that the court was in error in concluding that Mr. Wyman was authorized to write Exhibit 6 on behalf of the defendant.

IV. Lastly, defendant objects, to the court's instructions on damages. The controlling Montana statute provides that, " * * * Such damages may be given as under all the circumstances of the case may be just." Revised Code of Montana, 1935, § 9076. Here the court in its damage instruction states that the Montana law does not state a specific limit on damages that may be recovered. The Montana statute is then set out in full, and this is followed by a statement that if the jury finds for the plaintiff they may allow such damages under the circumstances of the case as may be just. The instruction given is somewhat involved and cumbersome. However, when considered as a whole, we believe that it properly informed the jury as to the Montana rule of damages. Plaintiff was 59 years of age, was in good health, was well employed, and earned a salary of $3,600 a year with unlimited expenses. The jury award of $15,000 furnishes no support for a conclusion that the jury misunderstood the instruction, and that they failed to limit the verdict to such an amount as was just.

A further objection to the instructions as to damages is that the court after opening a paragraph with the words "If you find for the plaintiff," later in the same paragraph in calling attention to various elements to be considered stated, "You should further consider * * *" and "also consider and include * * *." Substantially the same phraseology was used in defendant's requested instruction No. 7, which is followed to some extent in the instructions given by the court. We are not convinced that the instruction as a whole misled the jury. We conclude that there was no prejudicial error in the court's instructions.

The judgment appealed from is affirmed.