MARY KILEY v. SWARD-KEMP DRUG COMPANY
AND ANOTHER.[1]

April 2, 1943.

No. 33,355.

[1]Reported in 9 N. W. (2d) 237.

*Reynolds & McLeod* and *Hall, Catlin & Gold,* for relator.

*Sexton, Mordaunt, Kennedy & Carroll* and *E. D. McLean,* for respondents.

JULIUS J. OLSON, JUSTICE.

*Certiorari* to review an order of the industrial commission denying relator compensation.

Since the only question presented by the writ is whether the facts and the inferences reasonably to be drawn therefrom sustain the commission's finding that relator's injury did not arise out of and in the course of her employment, it becomes our duty to review the record in the light most favorable to what the statutory fact-finding body has determined them to be.

Miss Kiley resides at Marshall with her parents and during the time presently important was employed by respondent Sward-Kemp Drug Company, a partnership, operating a retail drugstore in that city. She was in charge of the cosmetic department. Mr. Carlson, the manager and one of the partners of the store, was in active charge thereof, including its personnel. Shortly prior to Friday, September 5, 1941, a trip by Miss Kiley to Minneapolis to attend a cosmetic show came up for consideration between them. As a result thereof, she was directed to attend the show in

connection with her specialized work. Mr. Carlson "sent her" there "with expenses paid by the store." During the agreed time of her absence on this trip (from Friday to Sunday, inclusive) her customary wages were accruing to her wage account. She was given absolute freedom of choice with regard to the route to be taken both when going to Minneapolis and returning therefrom, including the methods and means of transportation. Only two requirements governed her during her absence: she was to attend the cosmetic show and be back on the job the following Monday. Accordingly, Miss Kiley left Marshall for Minneapolis by bus and arrived there about noon. Pursuant to arrangements previously made with her brother, she was met at the bus depot by him, his fiancée, Miss Cliff, and the latter's mother, Mrs. Wilson, who resides at Glenwood. She attended the cosmetic show that afternoon, and, in conformity with an agreed plan, she and the others mentioned drove to St. Cloud during the evening, where both her brother and his fiancée were employed at the Spaniol Hotel. Miss Kiley and Mrs. Wilson spent Saturday shopping and visiting at St. Cloud. The brother and his fiancée were engaged in their work until after midnight the following Sunday morning. They then drove to Mrs. Wilson's home at Glenwood and slept there from about five o'clock Sunday morning until about nine o'clock. Having had breakfast there, relator, her brother, and Miss Cliff were ready to go at 11 o'clock and then started on their trip to Marshall, Miss Cliff driving. She and the brother occupied the front seat, Miss Kiley the rear one. On their way an accident happened about six miles north of Montevideo, which is 39.2 miles north and a little east of Marshall. The regular state highway is No. 59, which is the shortest and best route between the two cities. While so proceeding over a graveled portion of the highway, Miss Cliff suddenly discovered that she was on a T road without having observed any signs so indicating. As a result, she was compelled suddenly to apply her brakes in order to make the turn, and this, together with the loose gravel on the road, caused

the car to tip over, injuring Miss Kiley. These are the facts upon which decision must rest.

All the commissioners were in accord that if Miss Kiley had suffered this accident on her return trip from Minneapolis to Marshall "by any of the direct usual routes" between those cities "there could have been no question that the injury would have been compensable."

The basis for the conclusion reached by the majority of the commission may be thus summarized: Miss Kiley attended the convention in the interests of her employer and in so doing was within the protection of the compensation act; but her trip from Minneapolis to St. Cloud and beyond was personal only and not in furtherance of or in connection with her employer's engagements or interests. But, because she chose a route "close to 100 miles longer," requiring her "to travel much at night"; because, when she and her brother and Miss Cliff set out from Glenwood on Sunday forenoon, "none of them had had much rest or sleep," Miss Cliff having "worked hard in her employment all day Saturday until 2:00 o'clock Sunday morning"; and, because Miss Cliff was unfamiliar with the road upon which she was traveling and while so traveling ran into loose gravel "at a considerable rate of speed [estimated at 45 miles per hour] and had to make a sharp turn in the road," therefore, so it seemed to the majority of the commission, "these hazards cannot fairly be said to have been hazards of her employment" but were "created by the private purpose rather than by her employment." In support they cite the following cases: Matter of Marks v. Gray, 251 N. Y. 90, 167 N. E. 181; Loucks v. R. J. Reynolds Tobacco Co. 188 Minn. 182, 246 N. W. 893; Reinhard v. Universal Film Exchange, Inc. 197 Minn. 371, 267 N. W. 223; Kayser v. Carson Pirie Scott & Co. 203 Minn. 578, 282 N. W. 801; Lindell v. Minnesota American Legion Pub. Co. 208 Minn. 415, 294 N. W. 416; Barrager v. Industrial Comm. 205 Wis. 550, 238 N. W. 368, 78 A. L. R. 679.

The following portion of the dissenting commissioner's opinion is helpful:

"Unlike the case of Marks vs. Gray [251 N. Y. 90, 167 N. E. 181, and the other cases] cited in the majority opinion, there was only one purpose for the trip from Glenwood to Marshall—the return of the employe to the scene of her employment. The employer and insurer contend that the employe having departed from the purpose of her trip to Minneapolis, could not again renew that purpose unless she returned to Minneapolis and resumed her homeward journey from that city. The employer, by his own admission, did not even suggest the kind of transportation the employe should utilize or the route she should travel in going to or returning from the place to which he had sent her. To hold that the entire trip from Minneapolis to St. Cloud, Glenwood and Marshall must be accomplished before Miss Kiley completed her personal errand, is placing restrictions upon the employe which the employer did not impose. The state highway maps indicate the mileage from Minneapolis to Marshall to be 153 miles, while the distance from Glenwood to Marshall is 109 miles. From the viewpoint of distance, the route taken by Miss Kiley involved seven-tenths of the highway risk as [compared with] that of the route from Minneapolis to Marshall. It does not appear logical to me to say that the employer did not contemplate any risk in the shorter travel from Glenwood to Marshall, when it is admitted that the employe would be entitled to the benefit of the compensation law if the accident had occurred on a return trip made directly from Minneapolis to Marshall.

"It is my opinion that after Miss Kiley had finished her personal call in Glenwood on Sunday morning and started directly for Marshall she re-entered her employment and was in the same status as if she had remained in Minneapolis on Friday and Saturday, visited her friends there and began her return journey from that city on Sunday morning."

We are not impressed with the reasons assigned by the majority. Obviously, when Miss Kiley left Glenwood, she was much nearer her home and place of employment than she would have been if

she had started from Minneapolis. If in order to reënter her employment she had returned to Minneapolis she would have been adding to her trip many needless miles. Nor has any other route than the one taken been suggested as shorter or safer. No sensible person would think of doing otherwise than she did, and certainly her employer never suspected that she would do anything so obviously wasteful of time and money, not to mention the additional Sunday road hazards in the congested Twin City area. Untenable also is the majority view that more risks were likely to exist on a trip from Glenwood to Marshall than from Minneapolis. Every Minnesota citizen of ordinary intelligence knows that more automobile traffic accidents occur on the highways in or near the Twin Cities than elsewhere in the state. Any automobile owner carrying liability insurance as a resident of the Twin Cities knows that it costs him almost twice as much for the same amount of insurance as it does those who reside in the smaller communities. Likewise, according to statistics of the state highway traffic department, the number of traffic accidents per mile is much greater on the highways between the Twin Cities and Marshall than on those between Glenwood and Marshall.[2] Since traffic density and consequent traffic risks on the Twin Cities-Marshall highways point to greater safety in travel by the route taken by Miss Kiley, she should not be denied compensation because she chose the route she did.

With regard to the "hard work" performed and "loss of sleep" sustained by Miss Cliff and relator's brother as constituting factors in the chain of causation contributing to relator's injuries, we find it impossible to go along with the majority of the commission. We have as yet not heard of any such reason being assigned or sustained in a compensation case. Contributory negligence is

---

[2]Inquiry at this office discloses the following "accident figures" for the year 1941:

Glenwood to Marshall via Benson and Montevideo—20 accidents, 2 deaths.

Minneapolis to Marshall, via Shakopee, Glencoe, Olivia, and Redwood Falls—146 accidents, 3 deaths.

out. Even if this were a negligence case, Miss Kiley, being a guest passenger occupying the rear seat and having no control of the driver (whose driving here is not criticized), could not be charged, upon this record, with contributory or any other form of negligence. If Miss Cliff and relator's brother had been working as hard and as long at a Minneapolis hotel instead of a St. Cloud hotel, all members of the commission would have been in full accord that compensation should have been granted.

With the wide-open authority given relator to go to Minneapolis and back, she was entitled to take advantage of any convenient route or means of travel. A ride with her brother and his fiancée was entirely permissible, even though it deviated from the direct route. We should carefully distinguish between a situation where the employer furnishes, designates, or pays for a *certain type* of transportation and one where the employe has a *carte blanche* authority as to route and means of travel. It seems highly technical and narrow to hold, as did the commission, that, with such liberty of choice, relator had to get herself back to Minneapolis or on a direct route from there to Marshall to be again within her mission. If we were so to hold we would, in the language of the dissenting commissioner, be "placing restrictions upon the employe which the employer did not impose."

■ We should bear in mind the oft repeated rule (Moore v. J. A. McNulty Co. 171 Minn. 75, 79, 213 N. W. 546, 548:

"At the outset it is proper to remind ourselves that the workmen's compensation act is highly remedial and should not be construed so as to exclude any employe from the benefits thereof unless it clearly appears that he does not come within the protection of the act."

■ And here, as in that case, since (171 Minn. 80, 213 N. W. 548) there is "no conflict in the evidence" or the inferences to be drawn from it on this phase, "we think that neither the referee nor the commission was justified in holding that the relator's injury did not arise out of his employment."

■ Upon the recited facts, we think the commission should not have adopted the findings of the referee but should have held that the accident arose out of the employment.

The decision of the commission is reversed with directions to award compensation to relator. She is also allowed $100 attorneys' fees in addition to statutory costs and disbursements.

YOUNGDAHL, JUSTICE (dissenting).

The conclusion reached by the majority appears to me to be opposed to the underlying purpose of the workmen's compensation act as it relates to injuries arising out of one's employment as construed by this court in previous cases. The act was devised to provide protection to workmen in the form of compensation for injuries arising from hazards having a reasonable relation to the employment and which followed as a natural incident of the work. It was designed to compensate employes for industrial accidents and not for accidents due to causes not connected with the employment. The philosophy of the statutory limitation to cases arising out of the employment was clearly expressed in State ex rel. Miller v. District Court, 138 Minn. 326, 164 N. W. 1012, L. R. A. 1918F, 881, decided in 1917, one of the earliest cases to arise under the act. The purpose of the act was to shift the burden of providing compensation for accidental injuries sustained during employment from the individual workman to the industry itself, without requiring the employe to prove fault or negligence on the part of the employer. State ex rel. Duluth B. & M. Co. v. District Court, 129 Minn. 176, 151 N. W. 912. It thereby abolished the common-law system of damages, which involved considerable delay, economic waste, and inadequate relief, whether viewed from the standpoint of employer or employe. In short, it was a salutary social development designed to force industry to bear industry's burden and to consider that burden as a proportionate part of the expense of production. On the one hand, the employe had a right of recovery without proof of negligence and without being subjected to the defenses of contributory negligence

and assumption of risk. On the other hand, compensation was restricted exclusively to those injuries arising out of and in the course of the employment; or, in other words, to those which had their origin in a risk reasonably connected with the employment. State ex rel. Miller v. District Court, 138 Minn. 326, 164 N. W. 1012, L. R. A. 1918F, 881, *supra*. That the act was designed to provide compensation only for those injuries sustained as a direct result of employment is manifest by the language of the act itself as first passed in 1913, where compensation was limited to cases (§ 1) where "personal injury or death is caused to an employe by accident arising out of and in the course of his employment." By L. 1913, c. 467, § 34(i), it was provided:

"Without otherwise affecting either the meaning or interpretation of the abridged clause, 'personal injuries arising out of and in the course of employment,' it is hereby declared:

"Not to cover workmen except while engaged in, on, or about the premises where their services are being performed, or where their service requires their presence as a part of such service * * * as such workmen."

This section was amended by L. 1923, c. 300, § 14(j), which added the following:

"provided that where the employer regularly furnishes transportation to his employes to or from the place of employment, such employes shall be held to be subject to this act while being so transported."

This amendment was precipitated by the case of Nesbitt v. Twin City F. & F. Co. 145 Minn. 286, 291, 177 N. W. 131, 10 A. L. R. 165, decided in 1920. See Radermacher v. St. Paul City Ry. Co. 214 Minn. 427, 8 N. W. (2d) 466. In the Nesbitt case the claimant was injured while riding to work in a conveyance furnished by the employer for that purpose. This court held that the express terms of the act as they existed at that time excluded claimant from the operation of the compensation law. Although the

court indicated that, while hardship might result in certain cases, any extension of the act so as to apply to cases of that character was a matter for the legislature to consider. The effect of the proviso in L. 1923, c. 300, § 14(j), was not to change the meaning of the words "arising out of and in the course of employment" as restricted, but to provide coverage where the employer regularly furnishes transportation to his employes to and from work. Since 1923 the legislature has frequently amended the act, but no amendment has been passed affecting the phrase "arising out of and in the course of employment," and the statute has remained the same from 1923 to the present time in that respect. The only extension of the act with reference to injuries arising out of the employment has been by judicial interpretation as the court has applied the phrase "arising out of and in the course of employment" to the varying factual situations which have come before it.

In the Miller case, 138 Minn. 326, 328, 164 N. W. 1012, 1013, L. R. A. 1918F, 881, *supra,* this court quoted with approbation a definition of the phrase "arising out of the employment" as laid down in McNicol's Case, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306, as follows:

"It (the injury) 'arises out of' the employment, when there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury. * * * It must be incidental to the character of the business and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

The foregoing language has been approved in a long line of decisions and in such recent cases as Kaselnak v. Fruit Dispatch, 205 Minn. 198, 285 N. W. 482; McKenzie v. Railway Express Agency, Inc. 205 Minn. 231, 285 N. W. 529; Corcoran v. Teamsters &

Chauffeurs Joint Council, 209 Minn. 289, 297 N. W. 4; Hanson v. Robitshek-Schneider Co. 209 Minn. 596, 297 N. W. 19; Cavilla v. Northern States Power Co. 213 Minn. 331, 336, 6 N. W. (2d) 812, 815, decided December 4, 1942. In the Cavilla case, the most recent expression of this court on the subject, it was stated:

"\* \* \* 'it [the injury] "arises out of" the employment when it reasonably appears from all the facts and circumstances, that there is a causal connection between the conditions which the employer puts about the employe and the resulting injury.' Excluded are injuries which do not occur while the employe is engaged as workman in the employer's service or *which are not caused by or spring from hazards incident to the employment.*" (Italics supplied.)

Thus, our duty is to apply to the particular facts and circumstances in each case the rule above stated, *viz.:* Did the injury spring from or was it caused by a hazard incident to the employment?

Relator in the instant case was not a traveling salesman with a roving commission and no fixed termini. She does not come within the rule, therefore, of the so-called "salesman" cases. Wold v. Chevrolet Motor Co. 147 Minn. 17, 179 N. W. 219; Howlett v. Midwest Distributors, Inc. 202 Minn. 247, 277 N. W. 913, and cases there cited. She was regularly employed with a fixed place of employment and definite hours, but was sent on a special mission to Minneapolis to perform the single task of attending the cosmetic show. She attempts to invoke the rule that a traveling employe is covered by the act while on a homeward trip.

"The same rules are applicable to traveling as to other employes, but with different result, compelled by the fact that in such cases the travel is in performance of the employe's duty. Where an injury occurs to a traveling employe while engaged in travel for the prosecution of the employer's business, it arises out of and in the course of the employment." Cavilla v. Northern States Power Co. 213 Minn. 331, 337, 6 N. W. (2d) 812, 815, *supra;*

Austin v. Leonard, Crossett & Riley, Inc. 177 Minn. 503, 225 N. W. 428.

But travel by an employe for his own purposes after working hours or in digression from the prosecution of the employer's business is not covered by the act. Lunde v. Congoleum-Nairn, Inc. 211 Minn. 487, 1 N. W. (2d) 606; Cavilla v. Northern States Power Co. *supra.* This is the rule also in the case of the salesman with a roving commission. See Erickson v. Erickson & Co. 212 Minn. 119, 2 N. W. (2d) 824; Reinhard v. Universal Film Exch. Inc. 197 Minn. 371, 267 N. W. 223; Kayser v. Carson Pirie Scott & Co. 203 Minn. 578, 282 N. W. 801; and Lunde v. Congoleum-Nairn, Inc. *supra,* where the court said, 211 Minn. 488, 1 N. W. (2d) 606:

"For relator, it is insisted, with misplaced confidence, that as matter of law compensation should be granted under the rule of the 'traveling men's cases,' * * *. Precisely, the argument is that 'so long as Lunde did the natural and customary thing which any salesman would do who had a roving commission such as his, and had four hours' time to kill waiting for a train, he was covered by the [compensation] Act.'

"Such argument assumes that it is impossible for a traveling man, even though he be otherwise and mostly engaged on his employer's business, to so depart therefrom on an enterprise of his own as to put him for the time being beyond coverage of the law. Obviously he may do so."

The cases involving the rule "arising out of employment" as related to a traveling employe were recently and exhaustively discussed in the Cavilla case, *supra,* and further consideration is unnecessary here.

The majority opinion places considerable faith upon the proposition that here the employe was afforded the privilege of selecting her route and mode of travel. It is true, in the absence of specific instructions the choice of routes is open to the employe, and his failure to take the shortest route is not a departure from his employment if he uses an ordinary, customary, and usual route.

Thomas v. Lockwood Oil Co. 174 Wis. 486, 182 N. W. 841. In the instant case, however, the employer specifically testified that it did not know relator's plans with regard to her proposed trip to St. Cloud, Glenwood, and Marshall, and we do not quite understand how the employer could give its authority for that of which it knew nothing. Implicit in the findings of the commission is the fact that the employer did not consent to the trip. It is not difficult to speculate as to what ludicrous results might arise if, as contended by the majority opinion, an employer could by acquiescence or consent extend the obvious scope and purpose of the compensation act to include injuries which do not have their origin in hazards reasonably connected with the employment.

In Kayser v. Carson Pirie Scott & Co. 203 Minn. 578, 282 N. W. 801, *supra,* one of the most recent cases on the subject, this court established a precedent which is not followed by the majority opinion in the instant case and yet is not expressly overruled. If we no longer believe this to be sound doctrine, I feel that in fairness to the members of the bar and litigants we should frankly and expressly overrule it and not permit its overthrow by implication to remain in the field of conjecture. In the Kayser case a traveling salesman, accompanied by his daughter, drove his automobile through New Ulm, to which he later intended to return to call on a customer. He proceeded to Pipestone for the purpose of enabling his daughter to keep an appointment there, after which he turned back toward New Ulm. Before reaching his destination his automobile was struck by a train, and he sustained fatal injuries. The court held that the injuries did not arise out of and in the course of his employment. In that case, the salesman had no regular route with fixed termini from which to start and return and was employed in a territory where both New Ulm and Pipestone are located. There the only issue to be decided was whether the salesman, after completing his personal errand at Pipestone and turning back to New Ulm, reëntered the scope of his employment so as to again come within the protective provisions of the compensation act. In affirming the decision of the indus-

trial commission denying compensation, this court said (203 Minn. 582, 282 N. W. 803):

"That call [to New Ulm] had nothing to do with the trip to Pipestone, *and he did not enter the course of his employment merely upon the fulfillment of his personal errand in Pipestone and the start of the return trip."* (Italics supplied.)

In the instant case, relator was sent on a special mission. She was not a salesman with a roving commission and without fixed termini, and the factual picture here presents a much stronger case for the denial of compensation than the Kayser case. The holding of the majority opinion herein is irreconcilable with the conclusion reached in that case.

Relator does not seriously contend in this case that the trip to St. Cloud and Glenwood was in the course of her employment. Her position is stated thus in her brief:

"If we assume that the employe departed from the scope of her employment in making the trip from Minneapolis to St. Cloud and thence to Glenwood, it follows that when she left Glenwood for the sole purpose of returning to Marshall she again entered the orbit of her employment."

The dissenting member of the industrial commission in his memorandum concedes that the trip to St. Cloud and Glenwood did not arise out of and in the course of the employment, and the effect of the majority opinion herein is that, as a matter of law, when relator left Glenwood for Marshall she reëntered her employment because she was homeward bound. This is not only directly contrary to the holding in the Kayser case but also against the decided weight of authority in other jurisdictions. Red Arrow Bonded Messenger Corp. v. Industrial Acc. Comm. 39 Cal. App. (2d) 559, 103 P. (2d) 1004; McNaught v. Standard Oil Co. 128 Neb. 517, 259 N. W. 517; Oram v. Moon Co. 285 N. Y. 42, 32 N. E. (2d) 785; Duggan v. Toombs-Fay S. & D. Co. 228 Mo. App. 61, 66 S. W. (2d) 973; Mountain v. Industrial Acc. Comm. 92 Cal. App. 176, 267 P. 913; Freeman v. Salem Reformed Church, 125 Pa.

Super. 367, 190 A. 159; Luke v. St. Paul Mercury Ind. Co. 140 Neb. 557, 300 N. W. 577; Kinkead v. Management & Eng. Corp. (Mo. App.) 103 S. W. (2d) 545. The general rule as laid down in Restatement, Agency, p. 531, § 237, provides:

"A servant who has temporarily departed from the scope of employment does not re-enter it until he is again *reasonably near the authorized space and time limits* and is acting with the intention of serving his master's business." (Italics supplied.)

*Reëntry is not affected merely by turning the course back in the general direction of the place of employment. Where a servant deviates from the scope of his employment for his own purposes he is still upon his own trip, even though engaged in returning to his employment, until he has returned either to the point of departure from the path of duty or to a point where in the performance of duty he is required to be.* 42 C. J. pp. 1112-1113; and Kinkead v. Management & Eng. Corp. (Mo. App.) 103 S. W. (2d) 545; Kayser v. Carson Pirie Scott & Co. 203 Minn. 578, 282 N. W. 801; and Luke v. St. Paul Mercury Ind. Co. 140 Neb. 557, 300 N. W. 577, *supra.*

In the present case, relator took a detour which necessitated traveling 100 miles farther than the direct route back to Marshall from Minneapolis. The distance from Minneapolis to Marshall is 153 miles; from Glenwood to Marshall, 109 miles; and from Minneapolis to Glenwood, 144 miles, or a total of 253 miles. In traveling to St. Cloud and Glenwood, she went in a northwesterly direction, whereas Marshall is in the southwestern part of the state. At the time of the accident she was six miles north of Montevideo and a considerable distance north of any reasonable or direct route from Minneapolis to Marshall. To permit an employe to fix his own limitations far beyond the sphere of the specific mission on which he is sent would be to avoid the very language of the compensation act. It also conflicts with the rule we have emphasized and consistently followed, that the injury must have a reasonable relation to the hazards of the employment.

As I view the facts, there is reasonable support for the commission's finding that the deviation from relator's employment was so substantial as to amount to an entire departure therefrom, and that employment was not resumed because she had not reached a point in reasonable proximity to the sphere of her duties. At what point, homeward bound from Glenwood to Marshall, relator would, as a matter of law, have made a reëntry is not for us to determine. Our responsibility is limited to determination of the question of whether the evidence reasonably supports the finding that reëntry had not been made.

It seems to me that in arriving at the conclusion reached by the majority, the rule as set forth in Reinhard v. Universal Film Exch. Inc. *supra,* which we have consistently followed, is now completely disregarded. Quoting from Maher v. Duluth Yellow Cab Co. 172 Minn. 439, 442, 215 N. W. 678, 679, the court said in the Reinhard case, 197 Minn. 375, 267 N. W. 225:

"It is for the triers of fact to choose not only between conflicting evidence but also between opposed inferences. * * * It is only where the inference upon which the challenged finding rests is not in itself reasonably supported or where it is clear that the whole evidence is in manifest and undeniable preponderance against it (even though there is some support for it in the evidence) that there should be a reversal."

It is my opinion, moreover, that when we hold as a matter of law that relator had reëntered her employment when leaving Glenwood we are usurping the function of the trier of fact and getting far afield from our duties as a court of review.

I do not overlook the holding in Moore v. J. A. McNulty Co. 171 Minn. 75, 213 N. W. 546, that the workmen's compensation act is highly remedial and should not be construed so as to exclude an employe from the benefits thereof unless it clearly appears that he does not come within the protection of the act. This is as it should be. On the other hand, we should not, by judicial legislation, write into the act a provision which virtually

provides insurance against all hazards though unrelated to and unconnected with the employment.

I am of the opinion, therefore, that the writ should be discharged and the order affirmed.

PETERSON, JUSTICE (dissenting).

I concur in Mr. Justice Youngdahl's dissent.

