PETER J. PETERSON v. JACK C. TAYLOR, INDIVIDUALLY
AND d.b.a. TAYLOR MOTOR COMPANY, AND OTHERS.
WATERHOUSE MOTOR COMPANY AND ANOTHER,
RESPONDENTS.

96 N. W. (2d) 247.

April 17, 1959—No. 37,623.

*Bauers, Pratt, Cragg & Barnett,* for relator.

*Gannon & Dahle,* for respondent employee.

*Tyrrell, Jardine, Logan & O'Brien,* for respondents employer and insurer.

THOMAS GALLAGHER, JUSTICE.

Taylor Motor Company of Minneapolis, a dealer in used cars, brings certiorari to review a decision of the Industrial Commission, granting workmen's compensation benefits to Peter J. Peterson, employed by it as a used car salesman. The appeal is based on the grounds that (1) at the time he sustained the accidental injuries for which compensation was awarded, Peterson was not engaged in his employment but was either in the employ of Waterhouse Motor Company, a corporation, or engaged in his own personal business; and (2) the evidence fails to support a finding that certain medical and hospitalization benefits awarded were for injuries which arose out of the accident.

On May 10, 1955, employee was seriously injured in an automobile accident on Highway No. 169, west of Hibbing, while driving a Cadillac belonging to Taylor Motor Company to the latter's place of business in Minneapolis. At that time, and for some time prior thereto, he was employed by Taylor Motor Company as a salesman on a commission basis. His duties included occasional trips outside of Minneapolis to pick up or deliver cars for his employer.

In May 1955, Waterhouse Motor Company, a corporation of Wadena, sold a Plymouth car to Taylor Motor Company in Minneapolis. Because its president, Homer T. Waterhouse, then needed transportation back to Wadena, Jack C. Taylor, owner of Taylor Motor Company, agreed that he might use the Cadillac for such purpose. It was then agreed that Waterhouse would return it to Minneapolis at a later date. Apparently

this arrangement was changed, and subsequently Taylor decided to go to Wadena to bring back the car. Bernard May, who was an employee of Taylor Motor Company and an officer of Waterhouse Motor Company, testified to conversations with Taylor on May 9, 1955, in which Taylor talked "about going up to Wadena with me [May] to pick up the car," following which he had telephoned Waterhouse to tell him that "Jack [Taylor] and I will be in there to pick it up"; that he was to remain in Wadena and that Taylor would bring back the car. He testified further that in his presence later that day Peterson had requested that Taylor grant him permission to accompany May so that he could pick up the car, attend to some personal business in Hibbing, and then return it to Minneapolis. With reference to this arrangement, May testified as follows:

"Q.   Did Mr. Taylor say it was all right?

"A.   Words to that effect.

"Q.   So it was arranged between the two of them in your presence that Peterson was to ride up with you to Wadena and bring back the car there to Mr. Taylor?

"A.   He was to ride up to Wadena and to pick up the car so he would have a car to use.

\* \* \* \* \*

"Q.   \* \* \* he was to bring the car back to Mr. Taylor?

"A.   \* \* \* yes \* \* \*.

"Q.   \* \* \* was anything said about when he would be back with the car?

"A.   He was going to be back on Tuesday evening."

Peterson likewise testified that Taylor had consented that Peterson accompany May to Wadena, pick up the Cadillac, and bring it back to Minneapolis, after attending to some personal business at Hibbing. He testified further that he had then accompanied May to Wadena, picked up the Cadillac at Waterhouse Motor Company there, and driven it on to Hibbing; that at Hibbing on May 10, 1955, he had telephoned Taylor in Minneapolis and Taylor then told him "to get back to Minneapolis"; that he left Hibbing to return to Minneapolis at about 7 p. m. Tuesday, May 10, 1955, via Highway No. 169, which

was the most direct route to Minneapolis from Hibbing, and was so engaged when the accident happened.

Taylor's version of these conversations was that Peterson had talked to him on May 9, 1955, and requested permission to accompany May to Wadena to pick up the Cadillac and drive on to Hibbing to attend to personal business there, and that he had finally agreed to this. He was asked:

"Q. * * * you understood that he was going to take your car and drive it up to Hibbing on his own time, and when he got through with his business, was going to return your car to your place of business * * *?

"A. On his own time, yes.

"Q. But he was going to return your car to you?

"A. Yes."

■ The evidence outlined appears ample to sustain the determination of the commission that at the time of the accident Peterson was acting within the scope of his employment by Taylor Motor Company. It is true that his trip from Minneapolis to Wadena, thence to Hibbing, and thence back to Minneapolis involved a two-fold purpose—one to attend to personal business at Hibbing, and the other to return the car to Taylor Motor Company in Minneapolis in accordance with Taylor's instructions. It would seem clear, however, that, after he had attended to his personal business in Hibbing and left there on the return trip to Minneapolis by the most direct route, employee's purpose was then directly in conformity with his instructions from Taylor and that his employment by Taylor Motor Company had been resumed. Under such circumstances, the principles expressed in Kiley v. Sward-Kemp Drug Co. 214 Minn. 548, 9 N. W. (2d) 237, are applicable. There the employee who worked in Marshall was directed by her employer in Marshall to attend a cosmetic show in Minneapolis. After the show, she engaged in a personal trip to St. Cloud. Later, on the route back to Marshall, and after leaving Glenwood, she was injured in an automobile accident. There we said (214 Minn. 552, 9 N. W. [2d] 240):

"* * * Obviously, when Miss Kiley left Glenwood, she was much nearer her home and place of employment than she would have been

if she had started from Minneapolis. If in order to reenter her employ-
ment she had returned to Minneapolis she would have been adding to
her trip many needless miles. * * *

* * * * *

"With the wide-open authority given relator to go to Minneapolis and
back, she was entitled to take advantage of any convenient route or
means of travel. A ride with her brother and his fiancee was entirely
permissible, even though it deviated from the direct route. We should
carefully distinguish between a situation where the employer furnishes,
designates, or pays for a *certain type* of transportation and one where
the employe has a *carte blanche* authority as to route and means of
travel. It seems highly technical and narrow to hold * * * relator had
to get herself back to Minneapolis or on a direct route from there to
Marshall to be again within her mission."

Here it seems equally illogical to hold that Peterson would have had
to first return to Wadena before it could be said that his employment
had been resumed. Such a route back is much longer than the one
chosen. After he had completed his personal business and had been
directed by his employer to return to Minneapolis *at once,* it is clear
that upon his departure from Hibbing for Minneapolis via No. 169 he
had resumed his employment by Taylor Motor Company.

■ Relator contends that the dominant purpose of Peterson's trip
was his personal business rather than that of his employer and that
hence the rule set forth in the Kiley case is not applicable. In support
of this position, relator cites Matter of Marks v. Gray, 251 N. Y. 90,
167 N. E. 181; Kayser v. Carson Pirie Scott & Co. 203 Minn. 578,
282 N. W. 801. We cannot escape the conclusion, however, that in
Taylor's mind the principal concern was to procure the return of the
Cadillac car to Minneapolis and that this was the dominant purpose of
the trip. The fact that he agreed that Peterson might use the car to
attend to some personal business was coincidental to the main reason
for the journey. Conceding there was a dual purpose to the trip, it
cannot be assumed that one of such purposes was more dominant than
the other. But even if it could be said that the dominant purpose of
the trip was in Peterson's interests, after that portion thereof had been

completed, the other purpose of the trip—the return of the car to Minneapolis—remained unfulfilled and came into operation when the return trip was commenced.

■ This situation is distinctive from that in Matter of Marks v. Gray, *supra,* relied upon by relator, where at the time of the employee's accident neither the employer's nor the employee's purpose for the trip had been fulfilled, so that inquiry into the immediate purpose of the journey at the time of the accident was deemed proper. Likewise, in Kayser v. Carson Pirie Scott & Co. *supra,* it was not established that at the time of the accident the employee was driving to reenter his employment. As the court stated (203 Minn. 588, 282 N. W. 806):

"* * * we need not discuss the very clear distinction between the situation in the case at bar and that presented by Fox v. Atwood-Larson Co. 203 Minn. 245, 280 N. W. 856, where Fox while on his vacation at Winona received a copy of a letter, which, as his employer said, amounted to an instruction to go upon his employer's business at the earliest possible moment."

In the instant case, as above stated, at the time of the accident Peterson had fulfilled his personal errand and was doing only what he had been directed to do by his employer, first by his instructions in Minneapolis, and later on the occasion of the telephone instructions conveyed to him in Hibbing.

■ Relator contends that there is no evidence to support an award of $50 due Minneapolis Neuropsychiatric Clinic and $417.70 for a hospital bill of the University of Minnesota Hospitals. With reference to the latter, the record indicates that when exhibit K covering this item was offered in evidence it was rejected because of the absence of medical testimony connecting the charges thereon with the accident. The referee then stated:

"* * * we have to have some medical testimony in the record connecting up these particular services with the claimed accidental injury * * * and with the understanding that if this is not in the record now and this witness is not able to produce it, I will allow this witness to testify as to the amount, if you will connect it up later on, showing the necessity for the services which he has now before him."

At the close of the proceedings, the following occurred:

"The Referee: * * * the parties are resting except as to possible further medical testimony with respect to Petitioner's Exhibit K.

"Mr. Dahle [counsel for employee]: I should have it understood that I request that if there is no agreement on Exhibit K, I reserve the privilege of reopening for all my testimony.

"The Referee: Yes, and in the event you're unable to agree, then Mr. Dahle you write me and tell me you want it reset in Minneapolis."

Subsequently, the referee received a letter from counsel for employer in which the following was set forth:

"After the conclusion of the hearing, Mr. Tyrrell [counsel for insurer of Taylor Motor Company] and I discussed the question of the reception of Exhibit K, the University of Minnesota Hospital bill, which was objected to upon the grounds of insufficient foundation. We have concluded that in the interests of having this case submitted to you for your decision that we will withdraw the objection interposed to this exhibit.

"It is our understanding that with this concession, the employe has now rested his case, and *since there is now no reason for his previous provisional resting* that all parties have rested." (Italics supplied.)

Relator now argues that while this letter was sufficient to authorize reception of exhibit K it did not supply the necessary evidence to connect it with the accident. It is clear that this letter led employee and his counsel to believe that any objection to the relevancy of this exhibit had been waived. Had any other intent been manifested therein, employee would have reopened the case to supply the needed evidence. It follows that relator is now estopped from taking any position other than that the exhibit was admissible as relevant to the issue of medical expense. In re Estate of Colby, 223 Minn. 157, 25 N. W. (2d) 769; 19 Am. Jur., Estoppel, § 72; see, also, 19 Am. Jur., Estoppel, § 80; Annotation, 79 A. L. R. 173.

It also seems evident from the concluding paragraph of the letter that the same conclusion may justly have been drawn with respect to the item of $50 due the Minneapolis Neuropsychiatric Clinic. This item is covered by exhibit J, which was left in the same category as exhibit K

at the close of the hearing. During the hearing employee manifested an intent to reopen the case to submit medical testimony to establish that this item of expense also was incurred as a result of the accident. The statement in the letter that "It is our understanding that with this concession, the employe has now rested his case, and *since there is now no reason for his previous provisional resting* that all parties have rested" (italics supplied) would account for employee's failure to submit any additional proof required and estop relator from denying the relevancy of this item as covered by the commission's award.

Employee is allowed $250 attorneys' fees in this court.

Affirmed.