# GAIL WILLIAMS, WIDOW OF GERALD M. WILLIAMS, DECEASED EMPLOYEE, v. HOYT CONSTRUCTION COMPANY, INC., AND ANOTHER.

237 N. W. 2d 339.

October 24, 1975—No. 44978.

*Walter E. Riordan* and *Stewart R. Perry,* for relator.

*Richards, Montgomery, Cobb & Bassford, Jerome C. Briggs,* and *Jack A. Rosberg,* for respondents.

Heard before Sheran, C. J., and Todd and Scott, JJ., and considered and decided by the court en banc.

SHERAN, CHIEF JUSTICE.

Certiorari to review a decision of the Workmen's Compensation Commission. The commission reversed the decision of the compensation judge and denied relator's claim for benefits on the grounds that her husband's death did not arise in and out of the course of his employment. We affirm.

Gerald Williams, relator's husband, was killed in a light-airplane crash near Lawton, North Dakota, on September 23, 1972. At that time he was employed as the general manager and executive superintendent of Hoyt Construction Company, Inc. (Hoyt). The company, a corporation wholly owned by Bruce Hoyt, engaged in roofing, siding, subcontracting, and remodeling work throughout the five-state area of Minnesota, Wisconsin, Iowa, and North and South Dakota. At the time of the fatal accident, the company was a party to a subcontract with Cloverleaf Development Corporation, which required Hoyt to install roofing and siding on 100 double bungalows at a missile site at Nekoma, North Dakota. The company maintained facilities so that its employees, many of whom were from the Twin Cities, could live at the jobsite.

On the morning of Saturday, September 23, 1972, decedent flew from Flying Cloud Airport in the Twin Cities to Langdon, North Dakota, a small town north of Nekoma and apparently containing the airport which served Nekoma. He piloted a light aircraft that had been rented by the company and used by him for company business a few days earlier. The purpose of decedent's trip is a subject of dispute. Respondents contend that decedent was to supervise the siding crew until the following Monday

as a substitute for his brother, a siding foreman, who was in the Twin Cities on a weekend work break, and to help with some problems that had developed in the job. Relator contends that the purpose of the trip was to price the work which had been done during the month and get the information back to the Twin Cities office so that it could be notarized and submitted to the contractor by September 25 for payment.

Decedent brought with him to Nekoma one Daniel Rasmussen, a sider, who was to begin work at the site. On Saturday evening at approximately 8 p. m., decedent and Mr. Rasmussen took off from the airport at Langdon in the rented aircraft. Approximately 20 minutes after takeoff, the plane crashed near Lawton, North Dakota, killing both men immediately. The reason for this flight and its destination is the subject of much dispute, as no flight plan was filed. Relator contends that decedent was returning to the Twin Cities with the pricing information so that the billing could be completed by Monday. Respondents contend that decedent was engaged in a side trip for personal reasons and intended to return to the Nekoma site in time for work on Sunday.

At the hearing before the compensation judge, the parties introduced a large volume of circumstantial evidence on the question of whether the fatal flight was motivated by business or personal purposes. Because of the importance of that evidence to the issues on appeal, we set it forth in some detail below.

As general manager and executive superintendent, decedent performed a variety of duties for Hoyt, including bidding jobs, procuring contracts, pricing, supervising other foremen and superintendents on the job, and assisting in the completion and collection of contracts. His function with the company might best be summarized as a "troubleshooter" and he set his own work and travel schedule. Mr. Williams held a private pilot's license, though he was not instrument-qualified, and would occasionally lease an aircraft for travel on company business.

On large construction projects, decedent's duties included traveling to the construction site and obtaining and reporting

back information as to the status of construction. The purpose of such reporting was to permit interim billing of the customer for the construction work. It was the custom of the company to send statements of completed work to customers twice each month, on the 15th and 25th, so that they could receive payments by the 1st and 15th of the following month. Generally, decedent obtained this information a day or two before the billing date and returned reports to the office of Hoyt for notarization and preparation of the billings.

Work on the Nekoma jobsite was commenced in June 1972 and continued through the summer and fall of that year, weather permitting, on a 7-day work week from sunrise to sunset. It had become the custom for the workers to stay at Nekoma for a 2-week period and then return to the Twin Cities for a weekend break. In order to accommodate these employees, Hoyt rented a trailer for the roofing crew and a farmhouse for the siding crew. A barn and Quonset hut at the farm were used for cutting and storing materials to be used on the job. This complex was some distance from the jobsite, the testimony placing it anywhere from 4 to 20 miles away.

During the course of construction a number of difficulties developed on the job. As a result, decedent made a number of trips to the jobsite to assist the siding crew with problems. He generally performed physical labor along with the crew. Decedent's visits generally lasted only 1 day, but he sometimes stayed several days and may have spent as long as a week there. It was his custom to stay in a room at the farmhouse with his brother, Harley, during such visits. Occasionally, decedent would substitute as foreman of the siding crew for his brother, the regular foreman, while the latter took a work break. Because of the difficulties with the siding application, it was necessary to have someone on the job to supervise the siding crew whenever they were working. Thus, Harley Williams and Bradley Hoyt, the roofing foreman, customarily took their work breaks at the same time as their crews.

On the Thursday before the accident, decedent, accompanied by his wife, flew to Eau Claire, Wisconsin, to "collect a job." He was scheduled to fly to Marquette, Michigan, to bid another job, but that trip was canceled and he returned to the Twin City office on Friday morning. The aircraft he used for this trip had been leased for a week and was the same one that he used for the trip to Nekoma.

On Friday evening, decedent met with Bruce Hoyt, president of Hoyt Construction Company. The two men discussed decedent's prospective trip to Nekoma and Bruce Hoyt asked decedent to take Daniel Rasmussen along. Rasmussen, a carpenter and a pilot himself, was expected to stay on the jobsite for at least a week. Apparently decedent and Hoyt did not discuss the details of the trip. Bruce Hoyt did not directly testify that the purpose of the trip was to obtain information for the September 25 billing, in spite of the fact that the billing information had not yet been obtained. On the contrary, he testified that he did not expect Mr. Williams to return during the weekend, and that he and decedent had no meeting scheduled on either Saturday or Sunday.

On Friday, Harley Williams drove to Minneapolis with four members of his crew for a weekend work break. At 8 or 9 p. m. he visited decedent's home and the two men discussed the status of the Nekoma project. Harley Williams informed his brother of the siders' progress on the job to date and of what work decedent could expect to have been accomplished by his arrival. Harley testified that he expected decedent to relieve him as supervisor of the siding crew until Monday.

Early in the morning of September 23, 1972, Gerald Williams left for Flying Cloud Airport in Minneapolis with a suitcase of work clothes which his wife had packed. Before leaving home, decedent told his wife that he "thought" he would return on Friday. Mrs. Williams testified, however, that her husband frequently gave inaccurate predictions of when he would return

from business trips. Decedent drove his wife's car to the airport, and she picked it up later in the day.

Decedent, with Rasmussen as a passenger, flew to the Langdon, North Dakota, Airport, about 12 miles north of Nekoma. They apparently drove into Langdon in a truck Harley Williams had left at the airport for them.

Upon their arrival, decedent and Mr. Rasmussen had lunch in a diner in Langdon with Bradley Hoyt and one of his roofers who had returned from a work break in Minneapolis earlier that morning. Decedent mentioned no plans to leave Nekoma that day, and Bradley Hoyt assumed that he would return to the farmhouse that evening.

During the afternoon, decedent met with the siding crew to discuss their progress. There is nothing in the record to indicate, however, that decedent obtained the billing information during this discussion, which was apparently general in character.

Little work was done on the jobsite Saturday, as the weather was wet and windy and the supervisors were not "pushing" the men. It does appear, however, that decedent and Daniel Rasmussen cut some siding materials in the barn at the farmhouse at some time during the day. Gerald Williams was to call the siding crew if they were to work on Sunday. Decedent apparently told no one that he planned to leave and gave no instructions about work to be done in his absence.

On Saturday evening, Bradley Hoyt and some of the other men went to the farmhouse to "raid the ice box." Hoyt saw decedent's suitcase in the farmhouse and thus expected him to return, but neither decedent nor Daniel Rasmussen returned to the house. Decedent had left his suitcase behind on previous occasions, however, when he returned to Minneapolis. Rasmussen also left his duffel bag behind.

At approximately 8 p. m. Saturday evening, decedent and Daniel Rasmussen took off in the rented airplane from the Langdon Airport. It was not known which of the two men was piloting the plane. The weather remained inclement, and another pilot

apparently heard decedent radio for the weather report to Minneapolis. There was testimony to the effect that the plane was not carrying sufficient fuel to reach Minneapolis. Approximately 20 minutes after takeoff, the aircraft crashed 6 miles west of Lawton, North Dakota, about 25 miles from the Langdon Airport. Lawton is due south of the Langdon Airport, while Minneapolis is to the southeast, but the aircraft could have been flying around bad weather to the east of Langdon or going to Fargo for refueling.

The roofing crew worked on Sunday, but apparently the siding crew did not work, as decedent did not call them. Bradley Hoyt was informed of the accident Sunday morning as he worked with his crew on the jobsite.

After the accident, Hoyt paid the full leasing bill for the aircraft involved. In the past, when decedent had used an aircraft leased for company business for his personal affairs, the company had backcharged him for the share of the rental attributable to personal use.

Relator raises four issues on this appeal: (1) Whether the evidence supports the commission finding that decedent was pursuing some personal rather than business purpose at the time of his death; (2) whether decedent's death arose in and out of the course of his employment as a matter of law regardless of whether the fatal flight was occasioned by business or personal motives; (3) whether the compensation judge erred in excluding certain hearsay testimony as to decedent's intentions; and (4) whether the compensation judge erred in excluding a copy of a Federal Aviation Agency investigative report regarding the crash.

■ The commission found that decedent's death did not arise in and out of the course of his employment, noting in its opinion that the evidence tended to show that decedent was not returning to Minneapolis Saturday night. The commission apparently proceeded on the tacit assumption that the accident arose in and

out of the course of employment only if the fatal flight was occasioned by business motives.

We think the evidence set forth above, though certainly not unequivocal, was sufficient to support a finding that the Saturday night flight was not made for business purposes. The scope of review of factual determinations of the Workmen's Compensation Commission is extremely limited. The test is not whether the finding is contrary to a preponderance of the evidence but whether the evidence is so strong that reasonable minds are forced to draw a conclusion contrary to that drawn by the commission. For a thorough discussion of the standard of review and the case law on the question, see Farnam v. Linden Hills Congregational Church, 276 Minn. 84, 149 N. W. 2d 689 (1967); 21 Dunnell, Dig. (3 ed.) § 10426 (14.2).

The evidence as summarized above is not so one-sided as to compel reasonable minds to conclude that decedent was engaged in returning billing information to the Twin Cities office of the company at the time of his death.

Relator argues that where the fatal accident occurred within the decedent's usual working hours, at the usual place of employment and while he was using equipment regularly furnished him by the employer, a presumption arises that the employee was acting in the course of his employment if there is no direct evidence as to his activities. See, Henry v. D. A. Odell Motor Co. 191 Minn. 92, 253 N. W. 110 (1934). Relator asks us to employ this presumption to reverse the commission's findings.

We believe that to do so would give the presumption evidentiary weight. Previously, we have treated the function of the presumption as a procedural one which merely shifts to the employer the burden of going forward with the evidence. See, Lange v. Minneapolis-St. Paul Metropolitan Airports Comm. 257 Minn. 54, 99 N. W. 2d 915 (1959). Here, the commission found that the presumption, if applicable, had been rebutted by the evidence introduced by respondents. That finding is reasonable in light of the evidence summarized above. It seems that the presumption

fulfilled its proper function—shifting the burden of going forward with the evidence to respondents—and should have dropped out of the case. The ultimate burden of proving the decedent was in the course of his employment when he met his death remains upon relator. See, Vroman v. City of Austin, 284 Minn. 541, 169 N. W. 2d 61 (1969).

While the presumption will be sufficient, when there is no evidence to the contrary, to sustain a finding that the accident arose in the course of employment despite the absence of any other evidence to support such a finding,[1] applying it to reverse the finding here would be to treat the presumption as substantive evidence and undermine the great deference we have traditionally paid to findings of fact of the commission.

■ Relator argues that decedent was covered by the provisions of the Workmen's Compensation Act even if the flight on the evening of September 23 was occasioned by some personal purpose of his own. The commission's opinion did not specifically discuss this issue, but tacitly proceeded on the assumption that coverage depended upon the purpose of the flight.

Our Workmen's Compensation Act generally applies only to accidents occurring on the employer's premises unless off-the-premises travel is a substantial part of the service for which the worker is employed. Minn. St. 176.011, subd. 16, provides in relevant part:

" 'Personal injury' means injury arising out of and in the course of employment * * * but does not cover an employee except while engaged in, on, or about the premises where his services require his presence as a part of such service at the time of injury and during the hours of such service."

The traveling employee is considered to carry the employer's premises with him while engaged in furtherance of the em-

[1] See, Chillstrom v. Trojan Seed Co. 242 Minn. 471, 65 N. W. 2d 888 (1954); Ohlsen v. J. G. Dill Co. 222 Minn. 10, 23 N. W. 2d 15 (1946); Olson v. Eck's Homemade Sausage Co. 194 Minn. 458, 261 N. W. 3 (1935).

ployer's business, and thus is covered by the act while engaging in such travel. See, Cavilla v. Northern States Power Co. 213 Minn. 331, 6 N. W. 2d 812 (1942); 1 Larson, Workmen's Compensation Law, § 25.00.

We, like most other courts, have developed a number of rules to facilitate applying these general principles to various fact situations. In arguing that the decedent's death arose in and out of the course of his employment as a matter of law, relator relies on three of these rules—the special-mission rule, the dominant-purpose rule, and the personal-benefit rule. We do not believe that any of these rules supports relator's contention that the purpose of the flight was irrelevant to a determination of coverage under the act.

The special-mission rule, simply stated, is that an employee on a special mission for his employer is covered from the time he leaves home until the time he returns.[2] A traveling employee may, however, so depart from the employer's business as to place himself temporarily beyond the coverage of the act.[3] An employee traveling for business purposes will place himself beyond the scope of the act if he engages in a personal enterprise of his

---

[2] It should be noted that this rule is normally applied only in fact situations where an employee with a fixed place and time of employment is required by his employer to travel to the place of work during a time when he would normally be off duty. See, generally, Youngberg v. The Donlin Co. 264 Minn. 421, 119 N. W. 2d 746 (1963); Nehring v. Minnesota Min. & Mfg. Co. 193 Minn. 169, 258 N. W. 307 (1935); 1 Larson, Workmen's Compensation Law, § 16.10. Thus, it might be more accurate to discuss the issue in terms of the "traveling man" rule, which holds that a traveling employee is within the protection of the act when within his usual territory. See, Howlett v. Midwest Distributors, Inc. 202 Minn. 247, 277 N. W. 913 (1938). The two rules are used almost interchangeably by the courts, however. See, Gumbrill v. General Motors Corp. 216 Minn. 351, 13 N. W. 2d 16 (1944); Lunde v. Congoleum-Nairn, Inc. 211 Minn. 487, 1 N. W. 2d 606 (1942).

[3] For a general discussion, see Lunde v. Congoleum-Nairn, Inc. *supra*; Gumbrill v. General Motors Corp. *supra*.

own in the form of a "severable side trip." In such a case, coverage is suspended until the employee completes the side trip or resumes travel toward his business goal.[4] Thus, if the fatal flight was a personal side trip, decedent was not covered by the act.[5]

The dominant-purpose rule was developed to deal with travel having both personal and business purposes. The employee is covered by the Workmen's Compensation Act if the business purpose is the dominant one.[6] The cases cited by relator in support of her contention that the decedent was protected by the dominant-purpose rule are not controlling here, for none of them deals

---

[4] See, e. g., Funk v. A. F. Scheppmann & Son Const. Co. 294 Minn. 483, 199 N. W. 2d 791 (1972); Johnson v. Range Blacktop Co. Inc. 278 Minn. 288, 153 N. W. 2d 823 (1967); Peterson v. Taylor, 255 Minn. 220, 96 N. W. 2d 247 (1959); Kiley v. Sward-Kemp Drug Co. 214 Minn. 548, 9 N. W. 2d 237 (1943); Cavilla v. Northern States Power Co. 213 Minn. 331, 6 N. W. 2d 812 (1942); Dahley v. Ely & Walker, 196 Minn. 428, 265 N. W. 284 (1936); Hasslen v. Carlson & Hasslen, 180 Minn. 473, 231 N. W. 188 (1930); State ex rel. Niessen v. District Court, 142 Minn. 335, 172 N. W. 133 (1919).

[5] Ward v. American Legion Edward B. Cutter Post 102, 286 Minn. 81, 174 N. W. 2d 325 (1970), on which relator relies, does not compel a contrary result. There, the employee was killed while returning home after the first day of a two-day convention and benefits were awarded. His return was necessitated, however, by the fact that no sleeping facilities were available at the convention and the question of coverage under the act was limited to whether decedent was an employee.

[6] The classic test was propounded by Mr. Justice Cardozo in Matter of Marks v. Gray, 251 N. Y. 90, 93, 167 N. E. 181, 183 (1929), as follows: "If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own * * *. If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal and personal the risk." In Kayser v. Carson Pirie Scott & Co. 203 Minn. 578, 581, 282 N. W. 801, 803 (1938), we adopted the same test, citing Mr. Justice Cardozo's language with approval.

with situations where one employee engages in two separate and distinct trips; rather, they all involve travel undertaken for the purpose of conducting both business and personal errands, with the personal errand requiring only a slight deviation in time and space from the business errand.[7] A severable side trip, such as is present in this case, will defeat the application of the dominant-purpose rule. See, Kiley v. Sward-Kemp Drug Co. 214 Minn. 548, 9 N. W. 2d 237 (1943).

The personal-benefit rule holds that an employee does not abandon his employment when temporarily acting so as to advance his personal comfort, for in so doing he becomes a more effective and efficient worker. See, generally, 1 Larson, Workmen's Compensation Law, § 21.00. The cases applying this rule, however, have limited it to activities which involve only slight deviations from the work and are reasonable under the circumstances, such as eating, drinking, smoking, using toilet facilities, warming oneself, getting fresh air, changing clothes, washing, sleeping, and resting.[8] The airplane trip involved here is obviously not an activity of this character. We can find no authority for applying the personal-benefit rule to severable side trips.

■ Relator next contends that the compensation judge erred in excluding certain testimony relating to decedent's intentions. During cross-examination of Bruce Hoyt, relator's counsel attempted to elicit testimony as to what Bradley Hoyt had said to Bruce Hoyt regarding decedent's intentions on the day of his death. Objections to this testimony were sustained on the grounds that it was hearsay and not the best evidence, as Bradley himself was to testify. Bradley Hoyt did in fact testify upon

[7] See, Oestreich v. Lakeside Cemetery Assn. 229 Minn. 209, 38 N. W. 2d 193 (1949); Kennedy v. Thompson Lbr. Co. 223 Minn. 277, 26 N. W. 2d 459 (1947); Rau v. Crest Fiberglass Industries, 275 Minn. 483, 148 N. W. 2d 149 (1967); Peterson v. Taylor, *supra*, footnote 4.

[8] See, e. g., Epp v. Midwesten Machinery Co. 296 Minn. 231, 208 N. W. 2d 87 (1973); Falkum v. Daniel Starch & Staff, 271 Minn. 277, 135 N. W. 2d 693 (1965); Sweet v. Kolosky, 259 Minn. 253, 106 N. W. 2d 908 (1960). See, also, 1 Larson, Workmen's Compensation Law, §§ 21.10 to 21.74.

direct examination that decedent had not discussed his intentions —whether to stay in Nekoma or to go elsewhere—on the day in question. Relator now suggests that the compensation judge erred in excluding the testimony of Bruce Hoyt. She claims that Bruce Hoyt would have testified to Bradley's reports to him of certain conversations Bradley had had with the personnel at the Langdon Airport and that these conversations would show that Gerald Williams had asked for the weather report to Minneapolis. When Bradley testified, relator's counsel asked him if airport personnel had told him whether there had been an inquiry as to the weather to Minneapolis. He responded affirmatively, but when counsel asked what he had been told, the compensation judge sustained respondent's counsel's hearsay objection. The compensation judge then suggested that relator produce the proprietor of the Langdon Airport, who would have direct knowledge of the matter, to testify to any inquires about the weather to Minneapolis. In response, relator's counsel offered to introduce a Federal Aviation Agency investigative report to show that Gerald Williams had made such inquiries. There ensued a lengthy colloquy between court and counsel as to the admissibility of the report on this point.

Relator does not contend that the exclusion of Bradley Hoyt's testimony was improper, but only claims that Bruce Hoyt's testimony should have been admitted because respondent introduced without objection hearsay evidence as to decedent's intentions. For several reasons, we find no merit to relator's contentions. First, McNab v. Jeppesen, 258 Minn. 15, 102 N. W. 2d 709 (1960), on which relator relies, does not establish a doctrine of "fair play" which would permit a party to introduce whatever incompetent evidence it desires by the simple expedient of failing to object to the introduction of incompetent evidence by the opposing party. Rather, the decision holds only that where inadmissible opinion testimony has been admitted and must be given probative force by the jury, the trial court must permit the party adversely affected by such testimony to introduce similarly inad-

missible testimony to rebut it. Second, relator's counsel failed to make an offer of proof as to what Bruce Hoyt's testimony would have been, so that we cannot say with certainty that relator's case would have been helped by it. Third, Harley Williams was permitted to testify that the Langdon Airport owner had told him that decedent had asked for the weather to Minneapolis. Finally, even if Bruce Hoyt's testimony had been favorable, it could not have affected the outcome, as the Workmen's Compensation Act provides that findings of fact must be based upon competent evidence.[9]

■ Relator's final contention is that the compensation judge erred in sustaining respondents' hearsay objection to the admission of the FAA investigative report discussed above. Relator's counsel attempted to make an offer of proof, but failed to read the report into the record, and the document itself was not included in the record by means of conditional admission, because relator's counsel had not obtained a properly certified copy. Unfortunately, we do not know what information the document contained. Relator now contends that the document would have shown the weather conditions in the area and thus supported an inference that decedent was flying to the Twin Cities by an indirect route in order to fly around bad weather. At the hearing, relator's counsel claimed that the document would show that there was bad weather extending south and east of Langdon for about 100 miles. He also indicated at the hearing that the report would show that decedent radioed for the Minneapolis weather. Relator's counsel then requested permission to bring the Grand Forks radio operator to testify or else to take his deposition and introduce it into evidence. For reasons which are not explained in the record, relator failed to take advantage of the extension of time granted by the compensation judge to obtain the radio operator's testimony.

Relator alleges that the compensation judge's refusal to admit

[9] See, Minn. St. 176.411, subd. 1.

this document was in violation of Minn. St. 600.13, which provides in relevant part:

"The original record made by any public officer in the performance of his official duty shall be prima facie evidence of the facts required or permitted by law to be by him recorded."

Both parties refer to Barnes v. Northwest Airlines, Inc. 233 Minn. 410, 47 N. W. 2d 180 (1951), where we held that the trial court had properly excluded from the evidence in a tort case involving an air crash a report of an army investigative board. We stated (233 Minn. 433, 47 N. W. 2d 193):

"* * * [R]eports or records of investigation and inquiries containing expressions of opinion or the exercise of judgment and discretion are not admissible in evidence as public records. [Citations omitted]. Defendant had no opportunity to cross-examine with reference to the report nor anyone making it. The conclusions contained therein were hearsay, and the court properly excluded it."

Relator contends that the report in question contained only facts and was not based on the exercise of judgment or discretion and contained no conclusions or opinions. Respondents take the contrary view.

Resolving this conflict seems impossible on the state of this record. It would seem that admissibility would depend upon what the report said as to the weather conditions and the alleged radio call inquiring about the weather to Minneapolis, and the method by which the FAA obtained the information included in its report. Information of this sort cannot be characterized as fact or conclusion or hearsay until it is seen. In the absence of a conditional admission or thorough offer of proof, it is impossible for us to say that the compensation judge, who actually saw the document, improperly excluded it under the Barnes test.

Affirmed.